COPY

FILED

**WRENN BENDER  LLLP**
Aaron M. McKown, California Bar No. 208781
Email: amckown@wrennbender.com
Paula L. Zecchini, California Bar No. 238731
Email: pzecchini@wrennbender.com
2 Park Plaza, Suite 550
Irvine, California  92614
Telephone.: (949) 202-5810
Facsimile:   (949) 679-7939

**HARRIS & MOURE, PLLC**
Hilary V. Keeling (State Bar No. 284518)
Email: hilary@harrismoure.com
Charles P. Moure (Wash. Bar No. 23701)
Email: charles@harrismoure.com
600 Steward St., Suite 1200
Seattle, WA 98101
Telephone: (206) 224-5657
Facsimile: (206) 224-5659

13 JAN 30 PH 1:25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

Attorneys for Defendants
SEA SHEPHERD CONSERVATION SOCIETY, AN OREGON NONPROFIT
CORPORATION, AND PAUL WATSON, AN INDIVIDUAL

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADY GIL, an individual, and EARTHRACE LIMITED, | Case No.  **CV13-00657-GW(PLAx)** |
| Plaintiffs, | **DEFENDANTS' NOTICE OF REMOVAL** |
| v. | |
| SEA SHEPHERD CONSERVATION SOCIETY, a California Corporation, PAUL WATSON, an individual, and DOES 1 through 25, inclusive, | |
| Defendants. | |

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1      Pursuant to 28 U.S.C. §§ 1332, 1333 and 1441, Defendants Sea Shepherd

2    Conservation Society, an Oregon nonprofit corporation (erroneously sued as Sea

3    Shepherd Conservation Society, a California corporation) and Paul Watson

4    ("Defendants") hereby give notice of the removal of the above-captioned action,

5    Case No. BC498714, currently pending in the Superior Court of California, County

6    of Los Angeles, to the United States District Court for the Central District of

7    California. As grounds for removal, Defendants state the following:

8                          **STATEMENT OF THE CASE**

9      1.  On or about January 7, 2013, plaintiffs Ady Gil and Earthrace Limited

10   ("Plaintiffs") filed a Complaint in the Superior Court of California, County of Los

11   Angeles (Case No. BC498714), attached hereto as Exhibit A.

12     2.  Plaintiffs have not yet served Defendant Paul Watson with a copy of the

13   Summons or Complaint as of the date of the filing of this Notice of Removal.

14     3.  Defendant Sea Shepherd Conservation Society ("SSCS") is a nonprofit

15   organization formed under the laws of Oregon with its principal place of business in

16   Friday Harbor, Washington.  *Declaration of Charles Moure*, ¶2, attached hereto as

17   Exhibit B.  Paul Watson is a citizen of Canada.  *Id.* at ¶3.  Plaintiffs' Complaint

18   identifies Plaintiff Ady Gil as a resident of the State of California and Plaintiff

19   Earthrace Limited as a New Zealand business entity.  Complaint at ¶¶ 11, 12.

20   Therefore, for purposes of determining diversity jurisdiction, both Defendants are

21   diverse from both Plaintiffs.

22     4.  Plaintiffs' alleged claims all arise from a Charter Party Agreement

23   executed by Plaintiff Ady Gil and Defendant SSCS in November 2009, attached

24   hereto as Exhibit C.  Plaintiffs' Complaint alleges the existence of additional

25   maritime contracts, which Defendants dispute.   Nonetheless, Plaintiffs' Complaint

26   alleges facts sufficient for removal on the basis of admiralty jurisdiction.

27     5.  No further proceedings have occurred in the Superior Court of California,

28

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANTS' NOTICE OF REMOVAL

1    County of Los Angeles, in this action as of the date of the filing of this Notice of

2    Removal.   Defendants have not yet filed an Answer to the Complaint.

3                          **JURISDICTIONAL REQUIREMENTS**

4         6.  Pursuant to 28 U.S.C. § 1332, removal is appropriate if the parties are

5    completely diverse in citizenship and the amount of controversy, exclusive of

6    interest and costs, exceeds $75,000.  These requirements are met in this case.

7         7.  <u>Amount in Controversy</u>:   Plaintiffs allege claims against Defendants for

8    "not less than $5,000,000," exclusive of interests and costs.   Complaint at ¶¶ 40, 45,

9    51, 58, 63, 73, 78, Prayer for Relief.   In determining the amount in controversy for

10   purposes of diversity jurisdiction, the Court considers the allegations of the

11   Complaint, which merely provide an estimate of the total amount of the dispute, not

12   a prospective assessment of a defendant's liability. <u>See</u> 28 U.S.C. § 1446(c)(2); *see*

13   *also Lewis v. Verizon Comm., Inc.,* 627 F.3d 395, 399-400 (9th Cir. 2010).   Though

14   Defendants vehemently deny that Plaintiffs are entitled to any relief against

15   Defendants, Plaintiffs' allegations exceed the minimum amount in controversy

16   necessary for diversity jurisdiction.

17        8.  <u>Citizenship of the Parties</u>: The Parties are of completely diverse

18   citizenships.  Plaintiffs are, upon information and belief based on the allegations of

19   the Complaint, citizens of California and New Zealand.  Complaint at ¶¶ 11, 12.

20   Defendants are not citizens of California for purposes of 28 U.S.C. § 1332.  <u>See</u>

21   *Moure Declaration* at ¶¶2-3.   SSCS is an Oregon nonprofit organization with its

22   principal place of business in Friday Harbor, Washington.  <u>See</u> *Id.* at ¶2. Paul

23   Watson is a citizen of Canada.   *Id.* at ¶3.   As such, this action is between citizens of

24   different states and in which citizens or subjects of a foreign state are additional

25   parties under 28 U.S.C. § 1332(a)(3).   Consequently, this entire action may be

26   removed.

27        9.  Pursuant to 28 U.S.C. § 1333, removal is appropriate if Plaintiffs' claims

28

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANTS' NOTICE OF REMOVAL

1 arise under federal admiralty law and a secondary basis of jurisdiction exists either

2 under 28 U.S.C. § 1331 or 1332. These requirements are also met in this case.

3     10. Venue is proper pursuant to 28 U.S.C. § 1391, because the State action

4 was pending in Los Angeles County Superior Court.

5 **PROCEDURAL REQUIREMENTS AND LOCAL RULES**

6     11. Removal to Proper Court: This Court is part of the "district and division"

7 within which the pending State action was filed (Lost Angeles, County of Los

8 Angeles, California). 28 U.S.C. § 1446(a).

9     12. Removal is Timely: Removal of this action is timely pursuant to 28

10 U.S.C. § 1446(b). Defendants obtained a copy of Plaintiffs' Complaint on or

11 around January 8, 2013. Defendants are entitled to remove this action up to thirty

12 (30) days after receipt of a copy of the Complaint. Defendants' removal is timely.

13     13. Pleadings and Process: Pursuant to 28 U.S.C. § 1446(a), attached hereto

14 as Exhibit A is a true and correct copy of all process, pleadings, and orders obtained

15 by Defendants in this action.

16     14. Notice: Pursuant to 28 U.S.C. § 1446(d), a Notice of filing of Notice of

17 Removal, with a copy of this Notice of Removal attached thereto, shall be filed with

18 the Clerk of the Superior Court of the State of California, County of Los Angeles,

19 Central District, (Case No. BC498714) with a copy served on Plaintiffs' attorney.

20 Defendants will also file with this Court proof of service of such notice.

21     15. Consent to Removal: As of the date of the filing of this Notice,

22 Defendant Paul Watson has not been served with a Summons and Complaint.

23 Regardless, Defendants are represented by the same counsel and both named

24 Defendants consent to this Removal.

25     16. Signature: This Notice of Removal is signed pursuant to Fed. R. Civ. P.

26 11 and 28 U.S.C. § 1446(a).

27 ///

28 ///

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1     **REQUEST FOR ADDITIONAL**

2     **ARGUMENTS AND EVIDENCE, IF NECESSARY**

3     17.  In the event that Plaintiffs file a request to remand, or the Court considers

4     remand *sua sponte*, Defendants respectfully request the opportunity and specifically

5     reserve their right to submit such additional argument or evidence in support of

6     removal as may be appropriate.

7     **DEMAND FOR JURY TRIAL**

8     18.  Defendants Sea Shepherd Conservation Society and Paul Watson hereby

9     demand trial by jury pursuant to Fed. R. Civ. Proc. §38(b) and L.R. 38-1.

10     WHEREFORE, Defendants hereby remove the action now pending against

11     them in the Superior Court of the State of California, County of Los Angeles, to this

12     Honorable Court.

13

14     Dated:  January 29, 2013         **WRENN BENDER LLLP**
                                   Aaron M. McKown

15                                      Paula L. Zecchini

16

17                         By:

18                              Aaron M. McKown

19                         Attorneys for Defendants
                            SEA SHEPHERDCONSERVATION

20                         SOCIETY, AN OREGON NONPROFIT
                            CORPORATION, AND PAUL WATSON,

21                         AN INDIVIDUAL

22

23

24

25

26

27

28

- 4 -

**PROOF OF SERVICE**

    I am employed in the County of Orange, State of California. I am over the age of 18 years and not a party to the within action. My business address is 2 Park Plaza, Suite 550, Irvine, California 92614.

    On January 29, 2013, I served the foregoing **DEFENDANT'S NOTICE OF REMOVAL** on all interested parties in this action as follows:

**MAZZARELLA LAW GROUP**
Mark C. Mazzarella, Esq.
1620 Fifth Ave., Suite 725
San Diego, California 92101-3235

    [☒] BY MAIL - As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

    [☐] BY OVERNIGHT DELIVERY - Depositing the above document(s) in a box or other facility regularly maintained by FedEx in an envelope or package designated by FedEx with delivery fees paid or provided for.

    [☐] BY EMAIL – I caused a true copy of the foregoing document(s) to be served by electronic email transmission at the time shown on each transmission, to each interested party at the email address shown above. Each transmission was reported as complete and without error.

    [☒] FEDERAL - I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

    I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

    Executed on January 29, 2013, at Irvine, California.

LAURA T. JUAREZ

DEFENDANTS' NOTICE OF REMOVAL

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

# Exhibit A

1   **MAZZARELLA LAW GROUP**
    Mark C. Mazzarella, Esq. (SBN 082494)
2   1620 Fifth Ave., Suite 725
    San Diego, California 92101-3235
3   Telephone: (619) 238-4900
    Facsimile: (619) 238-4959
4

5

6   Attorneys for Plaintiffs
    Ady Gil and Earthrace Limited

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               COUNTY OF LOS ANGELES CENTRAL DISTRICT

10

11  ADY GIL, an individual, and EARTHRACE        Case No.
    LIMITED
12                                                **COMPLAINT FOR:**
              Plaintiff,
13                                                1. **BREACH OF WRITTEN**
         v.                                          **CONTRACT**
14                                                2. **BREACH OF ORAL CONTRACH**
    SEA SHEPHERD CONSERVATION                     3. **FRAUD: MISREPRESENTATION**
15  SOCIETY, a California corporation, PAUL       4. **FRAUD: PROMISE WITH NO**
    WATSON, and individual, and DOEs 1 through       **INTENTION TO PERFORM**
16  25, inclusive,                                5. **CONVERSION**
                                                  6. **UNFAIR BUSINESS PRACTICES**
17            Defendants.                         7. **NEGLIGENCE PER SE**
                                                  8. **NEGLIGENCE**
18

19

20

21                                               **DEMAND FOR JURY TRIAL**

22

23       Plaintiffs Ady Gil ("Gil") and Earthrace Limited ("Earthrace") allege the following claims

24  and causes of action against Defendants Sea Shepherd Conservation Society ("Sea Shepherd"), Paul

25  Watson ("Watson"), and Does 1-25 inclusive.

26

27

28

                                              1
                             Complaint and Demand for Jury Trial

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

JAN 07 2013

John A. Clarke, Executive Officer/Clerk
BY_____, Deputy
       Lakeylia Chambers

**B C 4 9 8 7 1 4**

I.  <u>NATURE OF THE CASE</u>

1.     On January 6, 2010, the ship Ady Gil was rammed by a Japanese whaling ship, the Shonan Maru #2, while supporting Sea Shepherd's attempts to disrupt the Japanese whaling efforts in the South Pacific Ocean, activities that had been featured for several years in the Animal Planet's television program "Whale Wars." Sea Shepherd, both through the Whaling Wars broadcasts, and through more traditional public relations networks told the world that the collision with the Japanese whaling ship sunk the Ady Gil. As alleged below, it lied.

2.     The Ady Gil, previously named "Earthrace," (hereinafter the "Ady Gil" or "Earthrace") was well known by the boating community, having recently won a race around the world while captained by Pete Bethune ("Bethune"), who as a volunteer with Sea Shepherd was captain of the Ady Gil at the time of the collision. The Ady Gil was owned by a New Zealand entity, Earthrace Limited, the majority of stock of which had recently been purchased from Bethune by Gil, who is a United States Citizen.

3.     Gil acquired control of Earthrace Limited for the express purpose of chartering the vessel to Sea Shepherd for $1 per year. The Ady Gil was chartered by plaintiffs to Sea Shepherd for the express purpose of assisting Sea Shepherd in its 2009-2010 campaign to stop Japanese whaling.

4.     Sea Shepherd, has supported its activities primarily from public donations, corporate sponsorships and from being featured in Animal Planet's "Whale Wars." Upon obtaining the use of the Ady Gil for its 2009-2010 campaign, Sea Shepherd engaged in a publicity campaign to promote its acquisition of the high-profile Ady Gil. The Ady Gil also became the focus of the "Whale Wars." Sea Shepherd's press release of Sea Shepherd's acquisition of the Ady Gil is still on its webpage as of the date of this filing. The video of the actual collision of the Ady Gil and the Shonan Maru #2 is also still featured on Sea Shepherd's web page as of the date of this filing. It is also widely available on other sites on the internet. To this date, Sea Shepherd continues to use the loss of the Ady Gil supposedly as a result of being rammed by the Japanese whaling vessel as a way of obtaining contributions from the public. And to this day, Sea Shepherd continues to deceive the public regarding what and who really sunk the Ady Gil.

5.      As the result of the collision between the Ady Gil and the Shonan Maru #2, the "nose" of the Ady Gil was torn off, and the Ady Gil was rendered inoperable. However, the Ady Gil was otherwise not damaged and was repairable. Initially, the intention was to tow the vessel to port less than 100 miles away for repairs. But then Paul Watson ("Watson") the founder and functional leader of Sea Shepherd, as well as the captain of one of the ships used by Sea Shepherd in its efforts to stop Japanese whaling, decided that the increased awareness of, and support for, Sea Shepherd that resulted from the collision would be taken to an even higher level if the collision did not just disable the Ady Gil, but rather sent it to the bottom of the South Pacific Ocean.

6.      After two days, during which time the Ady Gil remained afloat without taking on water or otherwise giving any indication that it was sinking, Watson, the captain of the vessel, Steve Irwin, (which along with the Ady Gil and the vessel, Bob Barker, constituted the three vessel armada of Sea Shepherd) decided unilaterally, and with no notice to or consultation with, plaintiffs, to sink the Ady Gil, in order to gain favorable publicity by claiming that the Ady Gil sunk as a result of the collision with the Shonan Maru #2.

7.      In order to carry out the scheme to deceive the public into thinking the Japanese had sunk the Ady Gil, and thereby obtain enhanced financial and other support from the public, Watson ordered Chuck Swift ("Swift") the captain of the Bob Barker, to flood the Ady Gil's engine compartment and turn off its GPS location devise. Swift then recruited Bethune and Luke Van Horn ("Van Horn") to assist him. Under cover of darkness, while others were sleeping, Swift, Bethune, and Van Horn carried out Watson's directive, and, to the extent possible, sank the Ady Gil. Because the material with which the hull of the Ady Gil is made is lighter than water, and therefore floats, it was impossible to completely submerge the vessel. However by sinking it to the extent possible, and turning off its GPS locater, defendants made it extremely unlikely that it would be found floating in the vast Pacific Ocean like a Kevlar and carbon fiber iceberg.

8.      In Furtherance of the scheme, Watson instructed Bethune and Swift to tell the media and the public, as Watson himself did, that the Ady Gil sunk as a result to the collision. In fact, in the episode of "Whale Wars" that depicted the collision, Watson was shown several times telling

1 Bethune that he should take advantage of the opportunity and "do all the media he can" regarding

2 the incident.

3      9.      Watson directed Bethune to keep the truth about the sinking of the Ady Gil a secret

4 and specifically not to tell Gil that his boat had been salvageable and was purposefully destroyed.

5 Gil only found out about the deliberate destruction of his property through an e-mail from Bethune

6 months after the events.

7      10.      Watson and others at the direction or request of defendants held fundraisers, one of

8 which was at Gil's house three days after the collision, and otherwise solicited contributions from

9 the public and sponsors to raise funds to replace the sunken Ady Gil. Some of the checks collected at

10 Gil's fundraiser had "To replace the Ady Gil" note in the memo of the check. A significant amount

11 of money was raised as a result of these efforts, yet none was ever put toward replacing the Ady Gil.

## II. THE PARTIES

13      11.      Plaintiff Ady Gil is a resident of the state of California and owner of Earthrace

14 Limited.

15      12.      Plaintiff Earthrace Limited is a New Zealand business entity and the record owner of

16 the Ady Gil.

17      13.      Defendant Sea Shepherd is a California Not For Profit Corporation.

18      14.      Defendant Watson was at all times acting as an agent of Sea Shepherd.

19      15.      The true names and capacities of Defendants sued herein as Does 1 through 25,

20 inclusive, are presently unknown to Plaintiffs, who therefore sues these Defendants by such fictitious

21 names. Plaintiffs will amend this Complaint and include these Defendants' true names and

22 capacities when they are ascertained.

23      16.      Plaintiffs are informed and believe and thereon allege that at all times mentioned

24 herein, each of the Defendants was the agent, alter-ego, servant, employee, instrumentality,

25 representative, partner or joint venture of each other Defendant and performed the acts as described

26 in this Complaint while acting within the scope of his, her or its authority and with the consent of

27 each other Defendant, and/or that each of the acts and/or omissions of every Defendant was ratified

28 by every other Defendant. Plaintiff is also informed and believes and thereon alleges that each of the

Defendants conspired to cause Plaintiff's damages alleged herein and/or aided and abetted each of the other Defendants in the commission of the acts and/or omissions alleged herein and/or aided and abetted each of the other Defendants in the commission of the acts omissions of the others, as alleged herein.

### III.    JURISDICTION AND VENUE

17.    Venue and jurisdiction is proper in this judicial district because the parties have so agreed, Gil resides in Los Angeles and some of the agreements which are the subject of this action occurred within this judicial district.

### IV.    FACTUAL BACKGROUND

18.    In the summer of 2009 Gil, an avid animal rights advocate, was asked by Watson to contribute $1,000,000 to Sea Shepherd to be applied toward the purchase of the Ady Gil. In September 2009 Gil e-mailed Defendants that he was considering making the requested donation, subject to Sea Shepherd adequately addressing several concerns and conditions Gil had relative to the acquisition and donation of the Ady Gil to Sea Shepherd. On September 11, 2009 Gil received responses by Watson and Steve Roest's [the new CEO of Sea Shepard] to [Gil's] concerns and requests" by e-mail to Gil from Susan Weingartner on behalf of defendants. In that e-mail, Ms. Weingartner represents that "we will do everything in our power to meet your needs as much as we're able, based on legalities, liability, non-profit rules that involve the IRS, etc." Among Gil's concerns and defendants' responses to them were the following:

1.    **Concern:** The Ship will crash in the ice and sink.

**Response:** Highly unlikely because I will keep the vessel out of the ice. The ship has just has [sic] one ton of Kevlar added to the hull so it is now much stronger and the Kevlar carbon fiber [sic] hull is already stronger than steel.

2.    **Concern:** The ship will break beyond repair....

**Response:** If and when repairs are needed it will be more expensive than a standard vessel of the type but not significantly so. Most parts are from

5

common sourced ships; the unique hull, now that we know how to build it, can be repaired or replaced altogether if necessary.

3.   **Concern:** If Sea Shepherd breaks its promises to me, not that I think that you guy [sic] will, you can keep the ship and turn the $1,000,000 into a loan.

**Response:** Agreed.

4.   **Concern:** Make it go to Israel soon before my parents pass away. I owe it to my father who is 81 years old and my mother who is 75 years old.

**Response:** I plan to take it to the Med for the tuna campaign and we would transit the Suez Canal so a stop in Israel would not be inconvenient. [Gil's father passed away in November 2012 having never seen the Ady Gil.].

19.   At the time of this exchange of e-mail, and at all times thereafter, defendants knew that Gil was proceeding with the acquisition and donation of the Ady Gil in reasonable reliance on the truth of defendants' responses to these concerns and requests, and on defendants' good faith intention to perform as represented. Nonetheless, defendants failed to honor these promises and representations, and Gil is informed and believes they never did intend to honor them, and that they were false when made. The falsity of each promise and representation, and/or defendants' failure to perform as promised, is demonstrated by defendants' actions relative to each:

A.   Knowing of Gil's concerns that the ship would crash and sink, Watson personally assured Gil that his concerns were unfounded; yet less than 4 months later, as alleged above, not only did Watson fail to assure the ship would not sink, Watson directed other agents, servants and/or employees of defendants to sink the Ady Gil and disable its GPS locator. As a result of Watson's acts, the Ady Gil was sunk. Rather than repair the damage to the vessel's hull, which Gil was assured, could be completely repaired, the ship is a total loss. Defendants even kept for themselves the electronic components that they stripped for the Ady Gil before sinking it.

B.   When the Ady Gil was damaged by the Japanese whaling ship, Shonan Maru #2, defendants did not repair it as was feasible. Rather, with full knowledge that it would not be difficult or prohibitively expensive to tow the Ady Gil to port for repairs, willfully and intentionally sunk the Ady Gil.

C.   After breaking its promises to Gil, Sea Shepherd has not converted the $1,000,000 donation into a loan, as it agreed it would.

D.   Rather than repair the Ady Gil so it could be taken to Israel to be seen by Gil's parents as promised, it was sunk to perpetrate a public relations fraud by falsely claiming that the Ady Gil was sunk be the Japanese whalers, rather than willfully sunk by Defendants. Petitioner is informed and believes that his public relation fraud was perpetrated in an attempt to obtain sympathy for Sea Shepherd and to create animosity toward the Japanese whalers and thereby obtain increased financial support for Sea Shepherd through donations from the public. Meanwhile Gil's father, who passed away in 2012, never saw the ship.

20.   On October 8, 2009, Gil wrote defendants to inform them of his intention to make a $1,000,000 donation to Sea Shepherd for the express purpose of acquiring the Ady Gil (then, still named the Earthrace), subject to certain conditions.  Gil's letter ("hereinafter "the October Contract") was signed by Watson on October 8, 2009, and became enforceable according to its terms, which included the following provisions:

A.   If Earthrace is sold, lost at sea, or rendered permanently unseaworthy for any reason at any time prior to the twentieth (20th) annual anniversary of the date Sea Shepherd first retained the title to Earthrace, Sea Shepherd agrees to name another vessel Ady Gil, pending the availability of such a vessel for this purpose.

B.   Any suit to enforce the terms of the agreement must be instituted in the Superior Court of the County of Los Angeles.

7

21.     On October 8, 2009 Watson as further inducement for Gil to make the donation also handed Gil a letter from Watson personally and on behalf of Sea Shepherd, stating, among other things, "If the Earthrace is lost in a campaign or by accident, The Sea Shepherd Conservation Society will apply your name to a replacement vessel." Watson further stated, confirming the trusting fiduciary relationship which existed between Gil and defendants, which was essential for Gil to be willing to donate $1 million for the acquisition of the Ady Gil, "I am proud to be partnered with you Ady. I think we will make a strong and effective team and we will make a significant impact on the poaching trade worldwide."

22.     As alleged herein, the Ady Gil was rendered permanently unseaworthy. Yet Plaintiffs are informed and believe that no effort has been made to name another vessel the Ady Gil.

23.     At the time the $1,000,000 donation was made by Gil to defendants, Earthrace as the Ady Gil was still known, was owned by an entity formed under New Zealand law entitled, "Earthrace Limited," a for profit company owned by Pete Bethune. Sea Shepherd deposited the $1,000,000 donation into its own account the day it was received from Gil.

24.     The $1,000,000 however, was never paid to Earthrace Limited as originally intended. Gil was told by Respondents that this was because it would take so long to transfer Earthrace's flag to Sea Shepherd if, Sea Shepherd purchased the Earthrace from Earthrace Limited t that the Ady Gil would not be able to participate in the upcoming campaign. Gil was also told by Respondents that if Sea Shepherd purchased the entity, Earthrace Limited, and thereby acquired ownership of Earthrace indirectly without loss of the flag, it would violate rules pertaining to not for profit entities such as Sea Shepherd that allegedly prevented a not for profit entity from owning a for profit entity

25.     To accomplish the objective of acquiring Earthrace/the Ady Gil for use by Sea Shepherd, without the delay that would be caused by the need to apply for a new flag,  and without violating the rules which defendants claimed prevented Sea Shepherd from having an ownership interest in a for profit company such as Earthrace Limited, it was agreed that Gil would personally purchase Earthrace Limited from Pete Bethune for $1.5 million, $1 million of which would be paid "up front" by Gil, and $500,000 remaining would be paid at a later date by Gil unless the Ady Gil was lost at sea, in which case it became Sea Shepherd's obligation to pay the remaining $500,000 At

1    the same time, Earthrace Limited agreed to lease/charter the Ady Gil to Sea Shepherd for $1 per
2    year. The $500,000 obligation was secured by a security agreement between Gil, Sea Shepherd and
3    Bethune, a true and correct copy of which is attached hereto as Exhibit "A."  Additionally a Charter
4    Agreement, a true and correct copy of which is attached hereto as Exhibit "B" was executed by Gil,
5    Sea Shepherd, and Bethune.

6         26.     Defendants told Gil that they would need to rescind the October Contract in order to
7    return the $1 million previously received by Sea Shepherd to Gil, (not physically but with respect to
8    the right of ownership), and then forward the $1 million, on Gil's behalf, to the trust account of a
9    lawyer in New Zealand who would prepare the new agreement to reflect the purchase of Earthrace
10   Limited by Gil, and the charter of the ship by Earthrace Limited to Sea Shepherd.  There was no
11   discussion, or mention, at any time, regarding any intent to change to the terms and conditions upon
12   which Gil had insisted in the October Contract and to which defendants agreed. Defendants
13   represented that the new agreement was simply going to reflect the different method of acquisition
14   and donation of the Ady Gil from Gil to Sea Shepherd. Gil believed any new agreement would
15   satisfy all of the conditions addressed in the October Contract. Gil further alleges on information and
16   belief that defendants knew that Gil believed the new agreement would contain the terms which
17   were essential to Gil and would be incorporated into the new agreement.

18        27.     While Gil was in a Air New Zealand terminal preparing to board a flight to New
19   Zealand, defendants gave Gil a document entitled "Rescission of Letter of Agreement Without
20   Reservation," which defendants represented had to be signed by Gil before the $1,000,000 could be
21   wired to the lawyer in New Zealand immediately. Gil had only a few minutes at the airport to review
22   the document, and was not able to have the benefit of legal review, advice, and comment.  Gil
23   accepted as true the representation contained in the document that rescission of the October Contract
24   was required because of "various laws that regulate charitable organizations," which Gil was told by
25   defendants referred specifically to the inability of a not for profit entity to own a for profit entity
26   such as Earthrace Limited.

27        28.     Had this representation been true, as Gil believed it to be since he trusted defendants,
28   it would have been impossible for Sea Shepherd to purchase Earthrace Limited as Gil ultimately did.

This was the sole justification for the rescission of the October Contract and replacement with new agreements. However, Gil is informed and believes that the representation was false, and at the time it was made, defendants knew it was false, and lied to Gil in order to convince him personally to buy Earthrace, rather than for Sea Shepherd to do so, and/or to provide an excuse for rescinding the October Contract.

29.    When Gil was asked to rescind the October Contract, he was told that it would be replaced with a new agreement. He believed the new agreement would not eliminate any of the specific conditions to which defendants agreed in the September 11, 2009 e-mail and which were in the October Contract. Gil is informed and believes that defendants knew that Gil would not proceed with the acquisition and donation of the Ady Gil without those conditions being a part of the agreement, and that at the time Gil signed the purported rescission document, Defendants knew that he believed the October Contract would be replaced with an agreement that contained the same conditions as the October Contract, which Gil had made clear were a requirement if he were to proceed.

30.    On or about November 24, 2009 Gil the Security Agreement, relative to the remaining $500,000 of the purchase price was executed, whereby Gil promised to pay Bethune the balance of the purchase price of Earthrace Limited, $500,000, secured by 2,057,291 ordinary shares of stock in the capital of Earthrace Limited.  At the same time, Gil, Bethune and Sea Shepherd executed the "Demise Charter Party Agreement," whereby Sea Shepherd chartered the Ady Gil for one year, from November 24, 2009 to November 23, 2010, with an option to renew the charter for an additional year on the same terms. While possession of the Ady Gil was transferred to Sea Shepherd, no rights of ownership were transferred, and Gil through his ownership of Earthrace Limited, retained the rights of ownership of the Ady Gil.

31.    Full authority regarding the operation of the Ady Gil was transferred to Sea Shepherd pursuant to paragraph 20 of the Charter Agreement, which also provides that any captain or crew members utilized by Sea Shepherd to operate the Ady Gil are the agents of Sea Shepherd, not Gil.

32.    Paragraph 17 of the Charter Agreement required Sea Shepherd to redeliver the Ady Gil to Gil at the end of the term of the charter, along with all of her equipment and furnishings.

Paragraphs 11 and 12 of the Charter Agreement provide that in the event of the total destruction of the Ady Gil, Sea shepherd was obligated to pay $500,000 directly to Bethune. However, if the Ady Gil was damaged, but not destroyed, Sea Shepherd was obligated to pay the $500,000 to Gil.

## V.   FIRST CAUSE OF ACTION

### Breach of Written Contract in Bad Faith (against Sea Shepherd)

33.   Plaintiffs incorporate the above paragraphs as though fully alleged herein.

34.   Sea Shepherd breached the express terms of its agreement with Plaintiffs. Furthermore, Sea Shepherd's breach of the contract was in bad faith and unfairly interfered with Plaintiffs' right to receive the benefits of the contract, and thereby breached the implied covenant of good faith and fair dealing

35.   As alleged below, the defendants' attempt to rescind the October Contract is void and unenforceable, as it was procured as a result of fraud, mistake and duress, and is inconsistent with the defendants' oral representations as to its content and effect, upon which Gil relied while fully performing his obligations under the agreement. Therefore, defendants also are estopped from asserting the October Contract is not valid and enforceable. Therefore, the agreement between Plaintiffs and Sea Shepherd is memorialized in 5 written documents, which constitute the contract between plaintiffs and defendants: (1) Defendants' September 11, 2009 e-mail to Gil responding to his concerns; (2) the October Contract; (3) Watson's October 8, 2009 letter to Gil; (4) the Security Agreement; and (5) The Charter Agreement.

36.   Defendants expressly and/or impliedly promised Gil in Defendants' September 11, 2009 reply to Gil's e-mail expressing his concerns, in  the October Contract in Watson's letter to Gil of October 8, 2009, in the Security Agreement and in the Charter Agreement, that: (1) they "would do everything possible to meet [Gil's] needs; (2) they would do everything possible to keep the Ady Gil from sinking; (3) that in the event of damage, specifically damage to the hull as occurred in the January 6, 2009 incident, the damage could be, and would be, repaired; (4) that if Respondents broke any of their promises to Gil the $1 million provided by Gil would be treated as a loan; (5) that if the Ady Gil was lost in the campaign, as it was, another ship would be given that name, and (6) that the Ady Gil would be taken to Israel soon for Gil's father to see.

37.   Plaintiffs fully performed all of their duties under the contract.

38.   Defendants breached the contract by intentionally sinking the Ady Gil, failing to take any action to either convert the $1,000,000 to a loan, or put Gil's name on another ship, and by failing to return the Ady Gil, along with all of its equipment and furnishings, at the end of the charter.

39.   Defendants' breaches of the contracts were in bad faith and deliberately calculated by defendants to interfere with Plaintiffs' rights to receive their contractual benefits.

40.   As a direct and proximate result of defendants' breaches, Plaintiffs have suffered damages measured by the value of the Ady Gill which is not less than $5,000,000. Plaintiffs have suffered other consequential damages as a result of the Defendants' breaches, the exact nature and amount of which are not currently known, but will be proven at trial.

## VI.   SECOND CAUSE OF ACTION

### Breach of Oral Contract (against Sea Shepherd)

41.   Plaintiffs incorporate the above paragraphs as though fully alleged herein.

42.   Plaintiffs and defendants entered into an oral contract when negotiating the terms of the agreement alleged above.

43.   Plaintiffs fully performed all of their duties under the contract.

44.   Defendant Sea Shepherd failed to fulfill its duties under the contract, which constituted a breach of the oral contract.

45.   As a direct and proximate result of Sea Shepherd's breaches, Plaintiffs have suffered damages measured by the value of the Ady Gill which is not less than $5,000,000. Plaintiffs have suffered other consequential damages as a result of the Defendants' breaches, the exact nature and amount of which are not currently known, but will be proven at trial.

## VII.   THIRD CAUSE OF ACTION

### Fraud - Intentional Misrepresentation (against all defendants)

46.   Plaintiffs incorporate the above paragraphs as though fully alleged herein.

47.   Among many representations, the Defendants represented to Plaintiffs that the Ady Gil would be safeguarded to the extent possible while under the Defendants' control that it would be

1  repaired if damaged, that it would be returned after the term of the charter expired, that another ship

2  would be named the Ady Gil if the Ady Gil was lost at sea, and that the Ady Gil would be taken

3  soon to Israel for Gil's parents to see. The Plaintiffs reasonably relied on the truth of these

4  representations by the Defendants.

5     48.    Further, defendants represented that the October Contract had to be rescinded,

6  requiring a new contract, as a means to deceive Plaintiffs into agreeing to terms that were different

7  than the negotiated terms of the original contract.

8     49.    The representations made by the Defendants were in fact false, and defendants knew

9  them to be false when made.

10    50.    Plaintiffs accepted as true and did reasonably rely upon defendants' representations.

11    51.    Defendants' acts were a substantial factor in causing plaintiffs damages not less then

12  the replacement value of the Ady Gil, at least $5 million dollars, and other incidental and

13  consequential damages the exact nature and extent of which will be proven at trial.

14    52.    Defendants' conduct was willful, fraudulent, malicious and oppressive, as a result of

15  which Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish

16  defendants and deter like conduct by defendants, and others, in the future.

17              **VIII.   FOURTH CAUSE OF ACTION**

18        **Fraud – Promise with No Intention to Perform (against all defendants)**

19    53.    Plaintiffs incorporate the above paragraphs as though fully alleged herein.

20    54.    On information and believe, Plaintiffs allege that when defendants made each of the

21  promises set forth above, they had no intention to perform as promised. Rather, they intended to treat

22  the Ady Gil as if it were a donation without conditions, and as if it were defendants' property to do

23  with as they wished.

24    55.    The Defendants' conduct as alleged above demonstrates that they never intended to

25  keep their promises.

26    56.    Furthermore, Defendants failure to convert the donation to a loan and to name another

27  ship the Ady Gil demonstrates Defendants' complete disregard for their promises, and their lack of

28  intention to perform their promises at the time they were made.

---

13

57.     Defendants knew that these promises were crucial to plaintiffs.

58.     Plaintiffs relied on defendants' false promises when entering into the above contracts and business transactions. That reliance was a substantial factor in causing Plaintiffs harm in an amount to be proven at trial, but not less than the replacement cost of the Ady Gil of $5,000,000.

59.     Defendants' conduct was willful, fraudulent, malicious and oppressive, as a result of which Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish defendants and deter like conduct by defendants, and others, in the future.

## IX.     FIFTH CAUSE OF ACTION

### Conversion (against all defendants)

60.     Plaintiffs incorporate the above paragraphs as if fully alleged herein.

61.     Plaintiffs owned or had an ownership interest in the ship the Ady Gill.

62.     By sinking the Ady Gil without the permission and against the wishes of plaintiffs instead of repairing it as promised, defendants converted Plaintiffs' personal property. Defendants intentionally and substantially interfered with Plaintiffs' property by destroying or causing to be destroyed.

63.     Defendants' conduct was a substantial factor in causing harm to plaintiffs in an amount to be proven at trial, but no less than $5,000,000.

64.     Defendant's conduct was willful, fraudulent, malicious and oppressive, as a result of which Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish defendants and deter like conduct by defendants, and others, in the future.

## X.     SIXTH CAUSE OF ACTION

### Unfair Business Practices: Business & Professions Code §17200 (against all defendants)

65.     Plaintiffs incorporate the above paragraphs as though fully alleged herein.

66.     Defendants are in the business of, among other things, obtaining funds from the public through donations, sponsorships and television programs to be used to preserve the oceans animal populations. Those who provide funding for the defendants' operations do so in significant part because defendants hold themselves out to be honest, sincere and dedicated, and because they share a common interest in preserving the oceans animal population in general, and whales in

14

1  particular in the face of commercial harvesting of sea creatures by segments of the world's

2  population, such as the Japanese whalers.

3          67.     In order to increase the level of donations, sponsorships and media exposure,

4  Defendants willfully and intentionally disseminated false information to the public.  Defendants

5  promoted the sinking of the Ady Gil by the Japanese as a way to increase donations generally, and

6  specifically used the sinking of the Ady Gil by the Japanese as a reason to have fundraisers.

7  Defendants knew that the sinking of the Ady Gil would be more likely to prompt the public to make

8  additional donations than just a collision in which the vessel was damaged, but repaired. False

9  information was given to the media and directly to the public by defendants as a publicity stunt

10  which constituted false and misleading advertising

11          68.     Defendants collected funds from the public under false pretenses that those funds

12  would be used to replace the Ady Gil which had been destroyed by the Japanese whalers. Those

13  funds were not used to replace the Ady Gil.

14          69.     The acts of the Defendants as described herein constitute an unfair business practice

15  from which they have obtained profits which they must disgorge.

16          70.     Plaintiffs seek disgorgement of all money collected as a result of all fundraisers and

17  the publicity created by the false news reports that the Ady Gil was destroyed by the Shonan Maru

18                          **XIII.  SEVENTH CAUSE OF ACTION**

19                          **Negligence (against all defendants)**

20          71.     Plaintiffs incorporate the above paragraphs as though fully alleged herein.

21          72.     Defendants conduct as alleged herein, and in particular the intentional sinking of the

22  Ady Gil, was unreasonable and fell below the standard of care applicable to persons of individuals

23  situated similarly to defendants.

24          73.     Defendants' conduct was a substantial factor in causing harm to plaintiffs in an

25  amount to be proven at trial, but no less than $5,000,000.

26

27

28

## XII. EIGHTH CAUSE OF ACTION

### Negligence per se (against all defendants)

74.     Plaintiffs incorporate the above paragraphs as though fully alleged herein.

75.     Section 594 of the California Penal Code states, in relevant part: "(a) Every person who maliciously [destroys] any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism.

76.     Defendants damaged and destroyed Plaintiffs' property, the Ady Gil with malice.

77.     That destruction of the Ady Gil was negligence per se, as it violated Penal Code Section 594, as outlined above.

78.     Defendants' conduct was a substantial factor in causing harm to plaintiffs in an amount to be proven at trial, but no less than $5,000,000.

## XI.    PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

1.  For compensatory damages according to proof at trial, but not less than $5,000,000;

2.  For restitution and disgorgement of any ill-gotten gains;

3.  For punitive damages up to nine times the amount of compensatory damages;

4.  For attorneys' fees and costs according to proof at trial;

5.  For any other such relief as the Court may deem just and proper.

Dated:     January 7, 2013                    MAZZARELLA LAW GROUP

By:

Mark C. Mazzarella
Attorneys for Plaintiffs

16
Complaint and Demand for Jury Trial

# EXHIBIT A

### SPECIFIC SECURITY AGREEMENT

THIS DEED is made the _24th_ day of _November_ 2009

**BETWEEN**   Ady Gil of the United States of America ("the Debtor") but which expression wherever appearing in this Instrument bears the meaning given it in clause 1 of Schedule B;

**AND**   Peter James Bethune of Auckland, New Zealand ("the Lender").

**WHEREAS:**

A   The Lender has agreed to provide to or for the Debtor from time to time financial services more particularly defined in this Instrument as "Moneys Secured".

B   The Debtor has agreed to execute this Instrument to secure the payment of the Moneys Secured in accordance with terms of this Instrument.

IN CONSIDERATION of the premises:

1.   The Debtor covenants with the Lender:

    (i)   To pay the Moneys Secured;

    (ii)   To observe and perform all the covenants conditions and agreements set out in this Instrument.

2   The parties covenant and agree that this Instrument is evidenced by these presents and Schedules A and B all of which are incorporated in and form part of this Instrument.

3   The Debtor HEREBY GRANTS A SECURITY INTEREST OVER all and singular the Collateral (as defined in this Instrument) to secure the payment to the Lender of the Moneys Secured and the faithful performance of all covenants conditions and agreements on the part of the Debtor contained or implied in this Instrument and in every Instrument or security which is or may be expressed to be collateral with this Instrument.

IN WITNESS this Deed has been executed the day and date written above.

**EXECUTED by Ady Gil**
In the presence of:                          )   _____

Witness Signature
_____

Witness Name   WILLIAM MALCOM PATTERSON
             SOLICITOR
             AUCKLAND
_____

Witness Occupation
_____

Witness Place of Residence

1

## SCHEDULE A

**PART I**
The security interest granted in the Collateral shall have the same priority in relation to all Moneys Secured, including future advances.

**PART II -- COLLATERAL**
Address at which located:n/a

Description of Collateral:

**INVESTMENT SECURITIES**

2057291 ordinary shares ("Shares") in the capital of Earthrace Limited ("Company") and includes all Rights.

**SCHEDULE B**
**SECTION 1: DEFINITIONS AND INTERPRETATION**
**Definitions**
1.01   In this Instrument unless the context otherwise requires:

1.01.1   "Collateral" means and includes:

(i)   the Collateral described in Schedule A; and

(ii)   all Collateral of a like kind to the Collateral described in Schedule A including after-acquired Collateral; and

(iii)   all licences held at any time by the Debtor in respect of the Collateral or any use or operation to which the Collateral may be put; and

(iv)   the proceeds of any of the Collateral

1.01.2   "Dealing" means any sale, assignment, exchange, transfer, concession, loan, lease, surrender of lease, bailment, tenancy, licence, direct or indirect reservation, waiver, compromise, release, dealing with or in or granting of any option, right of first refusal or other right or interest whatsoever or any agreement for any of the above;

1.01.3   "Demand" means demand made in accordance with clause 1.09.

1.01.4   "Encumbrance" means a mortgage, charge, pledge, lien, assignment by way of security, financial lease, hypothecation, encumbrance or other security interest given or arising in respect of any assets, present or future, and any arrangement the effect of which is to prefer any creditor over unsecured creditors, but does not include a lien or encumbrance arising by operation of law or a retention of title to goods purchased in the ordinary course of business.

1.01.5   "Event of Default" means any one of the events mentioned in clause 6.01.

1.01.6   "the Debtor" refers to the person executing this security in favour of the Lender together with its successors and assigns and where the security is executed by or on behalf of two or more persons the expression "the Debtor" refers to and shall bind all of those persons jointly and severally and their respective successors and assigns.

1.01.7   "Guarantor" means any person (not being the Debtor) who is liable whether as principal or surety, jointly severally, or jointly and severally for payment to the Lender of the Moneys Secured or any part of them, and includes the Covenantor.

2

1.01.8   "this instrument", "this security", and the like expressions includes the instrument of which this provision forms part (including the Schedules) as originally executed and as it may from time to time be amended.

1.01.9   "the Lender" includes the assigns and the successors of the Lender and in particular (but without limiting the generality of the foregoing) includes the assignees and transferees of the Lender's right title and interest in this instrument and shall be a reference to each person included within the expression severally as well as to any two or greater number of them jointly.

1.01.10   "Moneys Secured" has the meaning given it in clause 2.01 of Schedule B.

1.01.11   "Officer of the Lender" means any director, general manager, secretary or solicitor of the Lender.

1.01.12   "Receiver" includes a receiver and manager and when two or more persons are appointed as a Receiver the expression "Receiver" shall be a reference to each of them severally as well as to any two or greater number of them jointly.

1.10.13   "Rights" means:

    (i)     bonus shares, debentures or other securities;

    (ii)     options or rights to take up shares, debentures or other securities;

    (iii)     dividends, distributions, or returns of capital or other moneys; and

    (iv)     other rights, moneys or securities of any nature (including, without limitation, rights, moneys or securities arising from consolidation or subdivision of capital, redemption or conversion of shares, reduction of capital, liquidation or a scheme of arrangement)

at any time (whether now or in the future) attributable to or arising from the Shares.

1.10.14   "Transfer" means, with respect to the Shares or Rights, a transfer (or such separate number of transfers as the Lender may require) of the Share or Rights duly executed by the Debtor with the name of the transferee, date and consideration left blank, but otherwise, if appropriate, in proper form for registration by the Company.

**Interpretation**

1.02   Where the context requires or admits:

1.02.1   Words importing the singular number or plural number include the plural number and singular number respectively;

1.02.2   Words importing one gender include the other genders.

1.02.3   "Person" includes a company, corporation, statutory body, firm, society, or association or other body corporate (whether incorporated in New Zealand or elsewhere), an unincorporated body of persons, a public body and a department of Government;

1.02.4   Headings are for guidance only and shall not be utilised as an aid to the interpretation of any clause;

1.02.5   References to "written" and "in writing" include any means of visible reproduction;

1.02.6   References to Schedules, sections, clauses and paragraphs shall, unless the context otherwise requires, be to the Schedules, sections, clauses and paragraphs in this instrument;

1.02.7   The Schedules to the instrument and the provisions contained in them shall have the same force and effect as if set out in the body of the instrument

3

1.02.8    References to any statute shall be deemed to be references to that statute as it may from time to time be amended or re-enacted;

1.02.9    Expressions defined in a Schedule bear the defined meaning in the whole of this Instrument;

1.02.10    Any expression cognate with an expression defined in this Instrument shall have a meaning corresponding to the defined expression;

1.02.11    A covenant not to do anything also constitutes an obligation not to suffer, permit or cause that thing to be done;

1.02.12    A right granted or reserved may be exercised from time to time and at all times;

1.02.13    The illegality, invalidity or unenforceability of any provision in this Instrument shall not affect the legality, validity or enforceability of any other provision.

**Signatories**

1.03    This Instrument shall bind each of the signatories notwithstanding that one or more of the persons named herein as the Debtor or the Covenantor may never execute it or that the execution of this Instrument by any one or more of such persons (other than the person sought to be made liable) is or may become voidable.

**Counterparts**

1.04    This Instrument may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same Instrument.

**Delays and Waiver**

1.05    A waiver by any party of any of the obligations of any other party under this Instrument shall not prevent the subsequent enforcement of those obligations and shall not be deemed a waiver of any subsequent breach.

1.06    No delay by the Lender in exercising all or any of its rights remedies and powers upon the breach of any covenants conditions or agreements (expressed or implied) shall operate as a waiver of any such breach or prevent the Lender from at any time exercising all or any such rights remedies and powers.

1.07    This security may be enforced in respect of any default for the time being remaining unremedied notwithstanding the acceptance of an instalment of principal and interest or interest by the Lender after any default and notwithstanding any previous or other default and without the necessity of any notice to or of any further consent or concurrence on the part of the Debtor.

**Governing Law**

1.08    This Instrument shall be governed by and construed in accordance with the law for the time being in force in New Zealand.

**Notices**

1.09    Any notice to be given to or any demand to be made upon the Debtor or by or on behalf of the Lender shall be deemed to be duly given or made if it is in writing and signed by any person authorised by the Lender and if it is left at or sent through the post in a prepaid envelope or wrapper addressed to the Debtor at the usual place of abode or business or the registered office of the Debtor last known as such to the person signing the notice or demand or be delivered personally to the Debtor or be advertised in the New Zealand Gazette.

1.10    Any such mode of service shall in all respects be valid and effectual notwithstanding any other matter or event whatsoever.

1.11    Any such notice or demand if sent through the post shall be deemed to have been received by the Debtor at the time when the envelope or wrapper containing the notice or demand would in the ordinary course of post have reached the address to which it was posted and notwithstanding that it may never do so or if advertised upon the date of publication of the Gazette.

4

**Certificates**

1.12   A Certificate signed by the Lender or by any Officer of the Lender or by any person authorised by the Lender for the purpose stating the amount owing by the Debtor, or stating any other act matter or thing as at any date stated shall (except as is otherwise expressly provided in this Instrument) be prima facie evidence of the facts stated.

**Statutory Powers**

1.13   All other provisions of any statute or ordinance whereby any powers or privileges are conferred on Lenders shall be deemed (to the extent it is lawful to do so) to be negatived or varied only so far as they are inconsistent with the provisions of this Instrument.

## SECTION 2: PAYMENTS

**Moneys Secured**

2.01   In this Instrument the expression "Moneys Secured" shall mean all moneys which are now or may hereafter from time to time be owing to the Lender by either the Debtor solely (and if more than one person is named as Debtor, then severally by each person so named) or the Debtor together with any other person and including by way of example and not limitation, all moneys owing in respect of:

   (a)   Loans, credits, advances or other financial services made or given to or for the accommodation of or at the request of the Debtor;

   (b)   Any bill of exchange, promissory note, draft, order or other negotiable instrument drawn, accepted, endorsed, paid, discounted or held by the Lender at the request of the Debtor notwithstanding that such bill of exchange, promissory note, draft, order or other negotiable instrument may not have arrived at maturity;

   (c)   Any letter of credit or other facility for payment or receipt of moneys by or on behalf of the Debtor;

   (d)   Goods or services supplied by the Lender to or at the request of the Debtor;

   (e)   Payment made by the Lender for or at the request of the Debtor for goods or services acquired by the Debtor or any other person;

   (f)   The financing, shipment or confirming of goods on behalf of or at the request of the Debtor;

   (g)   The Lender entering into any lease, hire purchase or conditional purchase agreement or other similar agreement in respect of any real or personal property as lessor or vendor with the Debtor or any other person at the request of the Debtor or acquiring such property for such purpose or at the request of the Debtor taking an assignment (whether absolute or by way of security) of any such lease, hire purchase, conditional purchase or other agreement and of any property relating thereto;

   (h)   The Lender taking an assignment (whether absolute or by way of mortgage) of any debt or other obligation;

   (i)   Any indebtedness arising out of any guarantee, indemnity, bond or other obligation given or undertaken by the Debtor to the Lender or given or undertaken by the Lender for or at the request of the Debtor;

   (j)   All interest, commission, costs and charges payable by the Debtor to the Lender or incurred by the Lender in relation to this Instrument or any indebtedness secured hereunder including all those incurred by the Lender in the exercise or attempted exercise of the Lender's rights powers and remedies hereunder; and

   (k)   Any other indebtedness whatsoever of the Debtor to the Lender.

Any request by the Debtor to the Lender to provide financial accommodation or undertake any financial obligation of the types specified in clauses (a) to (k) (both inclusive) above to or for any other person shall result in the moneys owed by such other

5

person to the Lender being deemed to be moneys now or hereafter owing to the Lender by the Debtor.

2.02    The Moneys Secured shall include all moneys owing by the Debtor to the Lender as provided in clause 2.01 notwithstanding that they may be expressed to be secured by or chargeable against any other security held by the Lender or the Lender and any other person and notwithstanding that any agreement or arrangement between the Debtor and the Lender may not express any moneys therein referred to as being intended to be secured hereby. If and to the extent that any moneys which are secured by or chargeable against any other security held by the Lender are not included in the Moneys Secured or otherwise secured by this Instrument by virtue of the other provisions of this Instrument they shall be by virtue of this clause deemed to be included in the Moneys Secured and to be secured by the charge created by this Instrument.

**Repayment**

2.03    The Debtor will duly and punctually pay the Moneys Secured to the Lender at the times and in the manner agreed upon between the Debtor and the Lender from time to time or failing agreement upon demand served by the Lender in the manner provided in clauses 1.09 – 1.11. The Debtor will observe perform fulfil and keep all of the other covenants and conditions in any agreement between the Debtor and the Lender or between the Lender and any other person or persons where the obligations of the other person or persons are guaranteed by the Debtor.

**Payment of Interest**

2.04    The Debtor will pay to the Lender interest on the Moneys Secured from time to time whether demand has been made in respect thereof or not) and upon which no interest is payable under any other agreement or arrangement made between the Debtor and the Lender (unless there is an express agreement between the Debtor and the Lender that no interest shall be payable in respect thereof) at the highest rate of interest payable by the Debtor to the Lender under all other agreements or arrangements between them (being the highest default or penalty rate if such a rate is payable) (hereinafter called "the Interest Rate") calculated with daily rests from the date on which the moneys become payable such interest to be payable on the last day of each month in each year.

**Interest after Judgment**

2.05    If the Lender obtains judgment against the Debtor for any of the Moneys Secured, the Debtor shall pay interest on the sum for which judgment is obtained at the rate agreed upon pursuant to any other agreement or arrangement made between the Debtor and the Lender or if no such agreement or arrangement has been made then at the Interest Rate from the date of judgment until the date of payment of such sum.

**Variation of Interest**

2.06    The Lender may at any time by notice to the Debtor as from a date not earlier than 20 calendar days after the date on which notice is given alter the Interest Rate to another rate stipulated in the notice as the rate then currently required or to be required by the Lender in respect of securities of a kind similar to this Instrument and thereafter the stipulated rate shall become the Interest Rate and shall be payable accordingly.

**Set-Off**

2.07    At all times (and whether or not the Debtor is bankrupt, or in receivership or liquidation) the Lender shall be entitled to set-off any moneys owed to the Debtor by the Lender or property claimed by the Debtor from the Lender against any moneys owing to the Lender or property claimed by the Lender from the Debtor and included in the Moneys Secured.

**Application of Satisfaction**

2.08    The Lender shall be entitled at any time to appropriate any moneys paid to the Lender or held to the credit of the Debtor with the Lender on any account whatever or otherwise coming into the hands of the Lender in or toward payment or satisfaction of the moneys hereby secured or any part thereof.

6

**Mode of Payment**

2.09 All payments to be made by the Debtor in respect of Moneys Secured shall be made:

2.09.1 At such place and in such manner in New Zealand as the Lender may from time to time designate;

2.09.2 Free of any deductions whatsoever and free from and without regard to any equities or any set-off or cross-claim and the receipt of the Lender for such moneys shall be a good discharge;

2.09.3 Not later than 4.00 pm on due date (time being strictly of the essence) on a day on which registered banks in New Zealand are open for business or, where the due date for payment is not a day on which registered banks are open for business on the immediately preceding date on which registered banks are open for business. Where the Debtor fails to make payment by the requisite time it shall be deemed to have made payment on the next following day on which registered banks are open for business.

**Bank Orders**

2.10 Where the Debtor is required to execute a Bank Order for payment of the Moneys Secured interest and other moneys payable the Debtor will ensure that the Bank Order is maintained in full force and effect during the currency of the term of this instrument.

**Appropriation of Receipts**

2.11 So long as any moneys payable by the Debtor shall be owing or unpaid to the Lender and whether or not the time of payment shall have arrived the Debtor covenants not to require or direct the Lender to:

2.11.1 Appropriate or apply any payment credit or amount held or received by the Lender to or for any particular account of the Debtor whether or not at that time such account shall be in credit or debit; or

2.11.2 To pay the same to the Debtor; or

2.11.3 To restrict or interfere in any way with any right power or discretion of the Lender to apply such payment credit or amount in the Lender's hands and in such manner and for such purposes as the Lender shall think fit.

and any right which the Debtor may have had otherwise to do so is expressly negatived.

**Continuing Security**

2.12 This security shall be deemed to be a running and continuing security irrespective of any sums which may from time to time be paid to the credit of any account of the Debtor with the Lender and notwithstanding that any such account may appear at any time to be in credit. Notwithstanding any settlement of account or any other matter or thing whatsoever this security shall remain in full force and effect and shall not be deemed to have been released or discharged or in any way vacated until a Memorandum of Satisfaction shall have been executed by the Lender.

**Costs**

2.13 The Debtor will pay all costs and disbursements including legal and banking charges incurred by the Lender in connection with and incidental to:

2.13.1 The preparation and discharge of this instrument and of any collateral security and any related negotiations;

2.13.2 The exercise by the Lender in the enforcement of this instrument or any collateral security of any of the powers conferred on it under this instrument or under any collateral security.

**Indemnity**

2.14 If the Debtor makes default in the payment of Moneys Secured or any part on the date on which it is due and ought to be paid then the Debtor will indemnify and hold harmless the Lender from and against all losses costs claims and expenses arising from the non-

7

payment on due date of such sum. All such additional losses costs claims and expenses shall be payable upon demand and shall form part of the Moneys Secured.

## SECTION 3: CHARGE

**Collateral to be Acquired**

3.01   If this instrument is given as security for a loan or advance to be expended in whole or in part (to the extent required for the purpose) in the purchase by the Debtor of the Collateral or any of them THEN the Debtor will apply such loan (or such part as may be required for the purpose) in and towards the purchase forthwith and will do and execute all such acts deeds matters and things necessary to perfect the title of the Debtor to the Collateral subject only to this Instrument.

**Restriction on Further Charges**

3.02   The Debtor shall not without the prior written consent of the Lender:

3.02.1   Further encumber the Collateral or any part; or

3.02.2   Permit any act or thing whereby the Collateral may be or may be calculated to be charged in any way in priority to this security.

3.02.3   Do or permit any act matter or thing whereby any third party shall be entitled to put forward any claim or lien on the Collateral whether for repairs or otherwise.

**Restrictions on Disposal of Assets**

3.03   The Debtor shall not without the prior written consent of the Lender:

3.03.1   Deal with or dispose of any the Collateral;

3.03.2   Remove any of the Collateral to any place outside New Zealand.

**Collateral Securities**

3.04   This Instrument shall be collateral with all other deeds and securities given by any person whatsoever to secure the Moneys Secured or any part, including (without limitation) the guarantees of the directors of the Debtor. All such securities shall be read and construed together so that a default under one shall constitute a default under all but so that the Lender may exercise its rights powers and remedies under any of them either together or separately and in such order as it thinks fit.

3.05   In the event of there being any conflict between the provisions of this instrument and the provisions of any collateral security the provisions of this Instrument shall prevail.

3.06   Nothing in this Instrument shall be held to discharge abate or prejudice any other security or obligation (whether from the Debtor or any other person) now held or which may be held or taken by the Lender till payment of all the Moneys Secured.

3.07   This Instrument shall not merge in any judgment or order obtained for payment of the Moneys Secured or any part and such judgment or order shall be held collaterally with this instrument as security for the payment of the sums owing under such judgment.

**Lender Under No Duty to Marshall**

3.08   The Lender shall be under no duty:

3.08.1   To marshall in favour of the Debtor or other person this or any other security which may be held, or any of the funds or assets that the Lender may be entitled to receive or claim upon, in respect of the Moneys Secured; or

3.08.2   To claim or seek recourse or exercise rights against any other person in respect of any sums, and the Lender shall have full power to enforce or claim or exercise such of its securities rights and powers in such manner and for such part of the moneys hereby secured as it thinks fit.

8

**Covenant for Further Assurance**

3.09    The Debtor will (and will use its best endeavours to procure that all persons having or lawfully or equitably claiming any estate or interest in the Collateral or any of them will) upon the request of the Lender and at the cost of the Debtor until sale and afterwards of the person requiring the same make do and execute all such acts deeds and assurances whatsoever for securing to the Lender the payment of the Moneys Secured and for assuring the Collateral to the Lender or as the Lender may direct, and in particular will whenever requested by the Lender execute in favour of the Lender such legal mortgages transfers assignments or other assurances of all or any part of the Collateral in such form and containing (in the case of mortgages or other like assurances) such power (including power of sale) and provisions as the Lender shall require.

**Title to Collateral**

3.10    The Debtor:

    3.10.1    Covenants that it will unless the Lender otherwise agrees deliver to the Lender the documents of title to all Collateral over which the Lender shall have a first charge or in respect of which the documents are not required to be held by a prior encumbrancer or for which the documents may be in the Debtor's possession for any other reason;

    3.10.2    Hereby irrevocably authorises and directs any prior encumbrancer holding such documents that, upon such encumbrancer ceasing to be entitled to possession of such documents it shall deliver the same to the Lender and hereby authorises the Lender to issue in its own or the Debtor's name notices and demands upon any such prior encumbrancer to this effect.

3.11    The Lender may retain possession of the documents unless and until the charge created by this Instrument is released but the delivery and retention of such documents shall not of themselves operate to create any mortgage over the Collateral.

**Good Right to Charge and Performance of Debtor's Obligations**

3.12    The Debtor warrants to and agrees with the Lender that the Debtor has good right and ability to charge the Collateral free from all encumbrances (other than as may have been acknowledged by the Lender in writing) and all necessary corporate action has been taken by the Debtor (if a Company) to authorise and permit its execution of this security.

**Transfers**

3.13    The Lender may:

    3.13.1    Fill in any blanks in any Transfer and complete in favour of the Lender or anyone purchasing under the powers given by this Instrument, any Transfer or any other document executed by or on behalf of the Debtor

    3.13.2    Give notice to the Company of the existence of this Instrument and of the security interest created by this Instrument; and

    3.13.3    At any time, whether before or after the occurrence of an Event of Default, and without prejudice to any of its other rights, powers and remedies under this Instrument, cause itself to be registered as the holder of any of the Shares or Rights, in order to hold those Shares or Rights as the secured party in terms of this Instrument, and for that purpose may present any Transfer to the Company for registration.

**Warranties as to shares**

3.14    The Debtor warrants that:

    3.14.1    It is the beneficial owner of, and has good title to, the Shares, and the Shares are free of all securities except for the security created by this Instrument;

    3.14.2    The Shares are fully paid up;

    3.14.3    The Shares have been properly and validly issued and constituted in accordance with the constitution of the Company and all relevant laws; and

9

3.14.4   There is no money owing by it or its predecessors in title to the Company in respect of which the Company is entitled to a lien on any of the Shares.

## SECTION 4: COVENANTS

**Covenants**

4.01   The Debtor will:

4.01.1   Pay or discharge on or before due date all its liabilities, debts, outgoings, expenses and obligations of a monetary nature including without limitation any rents, rates, taxes, assessments, insurance premiums or amounts due under any contracts or other securities in respect of the Collateral.

4.01.2   Comply with all obligations duties and restrictions binding on it whether arising from contract common law statute regulation or otherwise including without limitation all covenants agreements or conditions contained or implied in any leases, sub-leases, agreements to lease, tenancy agreements or licences in respect of the premises on which the Collateral may be situated or in any debenture or other security affecting the Collateral whether prior to this Instrument or not;

4.01.3   Keep the Collateral in good order and in good repair and condition and renew or replace all assets essential to its business;

4.01.4   Carry on and conduct the business in connection with which the Collateral are used in an efficient, prudent and businesslike manner in accordance with best current commercial practice;

4.01.5   Duly and punctually comply with and observe all statutes now or at any time in force and all requirements and orders of any authority, statutory or otherwise relating to the Collateral or their use;

4.01.6   Obtain and maintain and not dispose of or allow to lapse or be revoked any licences, permits, authorisations, approvals or consents from any authority or person which are now or may hereafter be required or commercially advantageous for the retention or use of the Collateral and duly and punctually comply with all their conditions and stipulations;

4.01.7   Obtain and renew on time every authorisation, approval or consent necessary to enter into this Instrument, observe the Debtor's obligations under it and allow it to be enforced;

4.01.8   Immediately it is received or comes to the notice or knowledge of the Debtor, give to the Lender a copy of any notice requirement requisition demand or order of or on behalf of any authority, the non-performance of which or non-compliance with which may prejudicially affect this security;

4.01.9   Give to the Lender at least 7 days previous written notice of any change to the Debtor's name.

4.01.10   Not allow the Collateral or any part thereof to become an accession to any property that is not part of the Collateral or to become affixed to any land.

4.01.11   If it has not already done so, promptly deposit with the Lender the share certificates (if any) in respect of the Shares and if so required by the Lender Transfers of the Shares.

4.01.12   Deposit with the Lender the certificates or other documents of title in respect of all Rights, and if so required by the Lender transfers of those Rights, promptly upon execution of this Instrument, or forthwith upon those certificates or documents of title coming into possession of the Debtor.

4.01.13   Promptly deposit with the Lender any certificates or documents of title issued by the Company in substitution for or replacement of certificates or documents of title referred to in clauses 4.01.11 and 4.01.12.

10

4.01.14  If share certificates have not been issued in respect of the Shares, forthwith upon request by the Lender take all steps available to the Debtor to require the Company to issue share certificates in respect of the Shares.

4.01.15  If the Lender, or a Receiver presents to the Company for registration any Transfer of any Collateral, take all steps available to the Debtor to procure registration of that Transfer by the Company.

4.01.16  If the Lender so requires, take all steps available to the Debtor to ensure that the Lender's interest in any Share or Right or negotiable instrument of the Debtor is recorded by any relevant clearing house or securities depository, and in the case of a Share, on the records maintained by the Company or that Company's behalf.

4.01.17  Promptly upon becoming aware of the existence of any Rights attributable to or arising from any of the Shares (other than shares which are for the time being listed on NZX), provide to the Lender full details of those Rights.

4.01.18  Promptly deliver to the Lender a copy of any notice of meeting or other notice sent to shareholders of the Company, and a copy of any resolution passed by the shareholders of the Company.

## SECTION 5: INSURANCE

**Covenant**

5.01  The Debtor will insure and keep insured such parts of the Collateral as shall for the time being be of an insurable nature against loss or damage by accident theft malicious damage fire flood or earthquake and fire resulting from earthquake and also against public liability and such other risks as the Lender shall from time to time require.

**Insurance Requirements**

5.02  All such insurances shall be effected with such insurance office and for such amount as the Lender may reasonably require in the name of the Lender and the Debtor for their respective rights and interests, loss of any payable to the Lender whose receipt shall be a full discharge.

**Premiums**

5.03  The Debtor shall duly pay the premium and other sums of money payable in respect of the insurances and will on demand produce all cover notes insurance policies and the renewal receipts to the Lender and permit the Lender to hold the same.

**Prior Securities**

5.04  Compliance by the Debtor with the covenants to insure the Collateral contained in any prior ranking security shall be deemed, so far as it extends, to be due compliance with the covenant to insure contained in this section.

**Insurance Proceeds**

5.05  All or any moneys recoverable under any insurance on all or any of the Collateral shall be applied at the sole option of the Lender (subject however to the rights of any prior security holder) either in or towards rebuilding repairing restoring or replacing the property or assets or such of them as may be destroyed damaged stolen or lost or in or towards discharge of the Moneys Secured notwithstanding that time for payment may not have arrived.

## SECTION 6: EVENTS OF DEFAULT

**Events of Default**

6.01  The occurrence of any one or more of the following events shall constitute a default in terms of this instrument:

6.01.1  If the Debtor makes default in the payment of all or any part of the Moneys Secured on due date for payment or upon demand in the case of any money payable upon demand;

11

6.01.2   If the Debtor defaults in the performance or observance of any of the provisions of any covenant condition arrangement or agreement between the Debtor and the Lender;

6.01.3   If the Debtor defaults in the performance or observance of any provision contained or implied in this instrument or in any security collateral to this instrument (whether the Lender shall or shall not have waived any prior breach) which is capable of remedy and is not remedied within such time (if any) as the Lender may in its discretion allow;

6.01.4   If the Securities Commission makes a recommendation under section 38 of the Corporations (Investigation and Management) Act 1989 in respect of the Company or any Related Company;

6.01.5   If a compromise or arrangement is proposed between the Debtor and creditors or any class of them or if an application is made to a Court for an order summoning a meeting of creditors or any class of them;

6.01.6   (In the case of a corporate body) If the Debtor is wound up or a petition is presented or an order is made or a resolution is passed for the winding up of the Debtor or if a meeting is convened for the purpose of considering any such resolution;

6.01.7   (In the case of a corporate body) If any of the conditions necessary to render the Debtor liable to be wound up exists and continues for seven (7) days;

6.01.8   (In the case of a natural person) If a petition is presented or an order is made adjudicating the Debtor bankrupt;

6.01.9   If at any time any judgment of any Court against the Debtor remains unsatisfied for more than seven (7) days;

6.01.10   If distress or execution is levied or issued against any of the Collateral;

6.01.11   If the Debtor encumbers or attempts to encumber any of the Collateral or attempts to arrange any of those transactions contrary to the provisions of this instrument;

6.01.12   If there occurs in respect of any Guarantor (being a company) any of the events referred to in sub-clauses 6.01.4 to 6.01.7 or any Guarantor (being a natural person) is adjudicated bankrupt;

6.01.13   If the Debtor commits any breach of any of the provisions contained in any encumbrance over the Collateral or any part whether ranking prior to or pari passu with or subsequent to this instrument;

6.01.14   If any lease or licence of any property or part from which the Debtor is carrying on any business in connection with which the Collateral are used shall be determined by reason of any default on the part of the Debtor;

6.01.15   If in the opinion of the Lender or any Officer of the Lender the moneys advanced by the Lender or any part are applied for any purpose other than the purpose for which the same were advanced by the Lender;

6.01.16   If any works for which the Moneys Secured or any part are not carried out and performed in a manner satisfactory to the Lender or an Officer of the Lender or are not carried out or performed with due expedition;

6.01.17   If, in the Lender's opinion, there at any time occurs any event which (whether on its own or in conjunction with other events) could materially adversely affect the ability of the Debtor to carry on its business or perform its obligations under this instrument or which could materially adversely affect the Lender's security;

6.01.18   If any representation or warranty made by the Debtor in or in connection with this instrument shall be or at any time becomes untrue or misleading in any respect;

6.01.19   A resolution is passed or proposed, or any other step of any nature is taken:

12

(i)    to alter the constitution of the Company, or to alter the rights, privileges or conditions attaching to any Collateral, in such a manner as might in the reasonable opinion of the Lender detrimentally affect the interests of the Lender; or

(ii)    to increase or reduce the capital of the Company; or

(iii)    to obtain the approval of shareholders of the Company to a disposal of assets by the Company if that approval is required pursuant to the constitution of the Company; or

(iv)    to sanction any compromise or arrangement between the Company and its members or creditors; or

(v)    to compulsorily acquire any shares in the Company; or

6.01.20    The Company declares, pays or makes any dividend or other distribution to its shareholders if, in the reasonable opinion of the Lender, an effect of that dividend or other distribution is or will be to materially and adversely affect the value of the Shares.

## SECTION 7:  ENFORCEMENT OF SECURITY

### Inspection

7.01    At all reasonable times any Officer or duly appointed agent of the Lender may enter upon any land premises or property owned or occupied by the Debtor to view and inspect the property of the Debtor subject to this security and to carry out an audit or stocktaking of the operations of the Debtor. The Lender may demand reimbursement from the Debtor of expenses incurred in respect of any inspection audit or stocktaking.

### Lender May Satisfy Debtor's Obligations

7.02    In the event of the Debtor neglecting or failing to pay perform observe or comply with any of its covenants agreements or obligations generally or under this instrument whether or not of a monetary nature the Lender shall have the right (but without any obligation to do so) to perform or discharge or ensure compliance with any such covenant agreement or obligation whether by payment or action (including the employment of agents or other parties). All money which the Lender may pay or costs charges and expenses which it may incur shall from the time of payment or incurring be treated as part of the Moneys Secured and bear interest at the highest or any Penalty Rate payable under this instrument. Any such money and interest shall be payable by the Debtor to the Lender on demand.

### Statutory Powers

7.03    The powers conferred on a Lender by or under any statute or law shall be in augmentation of the powers expressly conferred by this instrument and may, to the extent it is lawful, be exercised by the Lender immediately upon or at any time after any default in payment of any of the Moneys Secured or in performance or observance of any covenant or agreement on the part of the Debtor without any notice or expiration of time being necessary.

### Rights may be Exercised at any Time After Default

7.04    Notwithstanding any delay or previous waiver the Lender may compel payment of any moneys due and payable in terms of clause 7.05 at any time following the occurrence of an event of default specified in clause 6.01 by pursuing any of the rights powers and remedies conferred upon it by these presents or by any other security or agreement or at law.

13

**Consequences of Default**

7.05    Upon the occurrence of any one or more of the events listed in clause 6.01 all Moneys Secured shall at the option of the Lender become immediately due and payable without the necessity for any notice of default or further demand by the Lender.

**Possession**

7.06    Upon the occurrence of any one or more of the events listed in clause 6.01 the Lender may in its discretion without any consent on the part of the Debtor:

   7.06.1    Take possession of the Collateral or any part;

   7.06.2    Either with or without taking possession sell call in collect and convert into money the Collateral or any part in such manner and for such consideration as the Lender shall think fit. Upon any such sale the Lender may:

   (i)    Sell any part of the Collateral either together or in parcels and either by public auction or by private contract and either for a lump sum or for a sum payable by instalments or for a sum on account and a mortgage or charge on the property sold for the balance;

   (ii)    Make any special or other stipulations as to title or otherwise which the Lender deems proper;

   (iii)    Buy in or rescind or vary any contract of sale of the Collateral or any part and resell without being responsible for any loss occasioned;

   7.06.3    Compromise and effect compositions, and withhold any progress payment or instalment otherwise payable by the Lender to the Debtor or any other person until default is remedied;

   7.06.4    Revoke any offer in respect of any funds not disbursed by the Lender by giving written notice of such revocation to the Debtor, and

   AND for all or any of the above purposes the Lender may execute and do all such assurances and things and effect such compromises and compositions as the Lender may think fit and exercise all such powers as are conferred upon Lenders by statute or law.

**No Liability as Lender in Possession**

7.07.5    The Lender shall not be liable to account as Lender in possession or for anything other than actual receipts or be liable for any loss on realisation or for any accidents occurring in the operations carried on or for any negligence default or omission for which a Lender in possession might be liable.

**Protection of Persons Dealing with Lender**

7.06    No person paying money to or otherwise dealing with the Lender shall be concerned to inquire whether any cause has happened to authorise the Receiver or the Lender to act or otherwise as to the propriety or regularity of acts purporting or intended to be done in exercise of the powers authorities and rights of the Lender under this instrument or under any collateral security.

**Omission or Delays**

7.07    It shall not be incumbent on the Lender to give any notice of this security to any debtors of the Debtor or to any person or to enforce payment of any moneys payable to any Debtor or of any of the debts charged or to take any steps or proceedings for that purpose unless the Lender shall think fit to do so. The Lender shall not be answerable for any omission or delay or for any involuntary losses or irregularities which shall happen in or about the exercise or non-exercise of any of the powers rights or remedies conferred on the Lender by this instrument.

## SECTION 8:  POWER OF ATTORNEY

**Appointment of Attorney**

8.01    The Debtor hereby irrevocably appoints the Lender and any Officer of the Lender and any Receiver to be its attorney in the name of the Debtor and at its expense in all things:

    8.01.1    To do and execute all such acts things mortgages proceedings (including legal proceedings) compromises instruments mortgages charges or other securities:

        (i)    Which the Debtor covenants or agrees to do or execute under the covenants contained in this instrument or in any collateral security;

        (ii)   Which the Lender or the attorney shall consider necessary or expedient to do or execute for the purpose of providing any further assurance or perfecting any security given or to be given in favour of the Lender or of facilitating the exercise by the Lender or by any Receiver appointed by it of all or any of the powers rights and remedies vested in conferred upon or exercisable in relation to the Collateral by this instrument or at law.

    8.01.2    To demand sue for recover and receive from any person and to give effectual receipts for all or any part of the Collateral to commence and prosecute settle and compromise all actions suits and proceedings for obtaining or enforcing payment or delivery and to proceed to judgment decree and execution or to discontinue proceedings or become non-suit, to act in all respects as the process of the Court or occasion may require and to receive money out of Court in any such action suit or proceeding;

    8.01.3    Generally to do perform and execute all such further and other acts deeds matters and things which shall be regarded by the Lender or the Attorney as necessary or expedient for more satisfactorily securing the payment of the Moneys Secured or as expedient in relation to the Collateral as effectually as the Debtor could or might do the same;

    8.01.4    For all or any of the above purposes from time to time to appoint any substitute and to remove such substitute.

**Ratification by Debtor**

8.02    The Debtor ratifies and confirms and agrees to ratify and confirm whatever any such attorney or substitute shall do or purport to do in the exercise or purported exercise of all or any of the powers, authorities and discretions referred to in clause 8.01.

## SECTION 9 - PERSONAL PROPERTY SECURITIES ACT 1999 ("PPSA")

9.01    The Debtor:

    (a)    agrees that if, at any relevant time, the Lender does not have priority over all other secured parties in relation to any Collateral, then the Debtor and the Lender will, for the purposes of section 109(1) of the PPSA, be deemed, in accordance with the entitlement to do so under section 107(1) of the PPSA, to have contracted out of that section but specifically on the basis that, as between them and for purposes of this Deed and the operation and application of the PPSA, that section 109(1) (but amended only by the deletion of the words "with priority over all other secured parties" is reinstated and contracted back into;

    (b)    agrees that nothing in sections 114(1)(a), 133 and 134 of the PPSA will apply to this Deed, or the security under this Deed; and

    (c)    waives the Debtor's right to do any of the following:

        (i)    object to the Lender's proposal to retain any Personal Property under section 121 of the PPSA;

        (ii)   not have Goods damaged when the Lender removes an accession under section 125 of the PPSA;

15

(iii) receive notice of the removal of an accession under section 129 of the PPSA;

(iv) apply to the Court for an order concerning the removal of an accession under section 131 of the PPSA;

(v) redeem any Personal Property under section 132 of the PPSA; or

(vi) to receive a copy of the verification statement confirming registration of a financing statement or a financing change statement relating to the security interest created by this Deed.

SEA3-1-23859

16

(iii)  receive notice of the removal of an accession under section 129 of the PPSA;

(iv)  apply to the Court for an order concerning the removal of an accession under section 131 of the PPSA;

(v)  redeem any Personal Property under section 132 of the PPSA; or

(vi)  to receive a copy of the verification statement confirming registration of a financing statement or a financing change statement relating to the security interest created by this Deed.

SEA3-1-23859

16

**EXHIBIT B**



**EARTHRACE LIMITED**

**SEA SHEPHERD CONSERVATION SOCIETY**

**DEMISE CHARTER PARTY AGREEMENT**

Patterson
Hopkins

THIS AGREEMENT is made this _____ day of _____ 2009 by and between EARTHRACE LIMITED a duly incorporated company having its registered office 470 Manukau Road, Epsom, Auckland and SEA SHEPHERD CONSERVATION SOCIETY of PO Box 2616, Friday Harbor WA 98250, USA

WHEREAS

EARTHRACE LIMITED (hereinafter called the Owner), owner of the Motor Vessel *Ady Gil* (formerly known as *Earthrace*), Registration number NZ 1271 designed by Craig Loomes Design Group Ltd built by Calibre Boats Ltd being an ultra slender trimaran now lying at the Maritime Museum, Viaduct Harbour, Auckland, NZ (hereinafter called the Vessel and, SEA SHEPHERD CONSERVATION SOCIETY (hereinafter called the Charterer) desire to hire the Vessel for a specified period

NOW THEREFORE the parties agree as follows:

AGREEMENT TO LET

The Owner agrees to let and the Charterer agrees to hire the Vessel on a bareboat basis for the Term of one year from 24 November 2009. The Charterer shall pay a Charter Fee of One US Dollar (US$1).

2.   The Charter Fee does not include any running costs, charges or a captain and crew, the cost of fuel or any other operating expenses, insurance liability insurance, boarding, embarkation and/or disembarkation and or fees, food and/or beverage and/or catering services consumed during the Charter Term all of which are expressly acknowledged to be the sole responsibility of the Charterer.

3.   The Charterer may renew this agreement for a further period of one year and otherwise on the same terms and conditions of this agreement by notice in writing to the Owner prior to the expiration of the Term referred to in clause 1 above.

INSPECTION AND DELIVERY

4.   The Charterer accepts the Vessel in its condition as inspected and approved prior to the date of this agreement.

5.   The Charterer shall have the right, but not the obligation, to haul and survey the Vessel at the conclusion of the Charter Term, provided, however, the cost of same shall be paid entirely by the Charterer.

6.   The Owner or its designated agent agrees to make ready the Vessel for departure from the Port of Auckland on or before the commencement date of the charter.

INTELLECTUAL PROPERTY

7.   For the period of the Charter Term and any renewal thereof the Owner assigns and transfers all right title and interest in and to any design patents, design

SEA3-1-23920

2

patent applications, copyrights and other intellectual property (collectively "IP Rights") in the Vessel and the design of the Vessel including but not limited to all rights to make, have made, or import, for sale or for use in trade, any useful article embodying that design, and sell or distribute for sale or for use in trade any useful article embodying that design.

## INDEMNIFICATION

8.   The Charterer agrees to accept liability for and indemnify the Owner against any and all liability, claims, loss, damage, injury, proceedings, costs, legal costs and other expenses of any nature whatsoever, arising directly or indirectly out of the use of the Vessel during the Charter Term or any renewal of the Charter Term.

9.   The provisions of clause 8 do not apply in relation to damage to or loss of the Vessel during the Charter Term or any renewal thereof. Clauses 11 and 12 apply to these events.

## INSURANCE; DAMAGE TO VESSEL; LOSS OF VESSEL

10.   The Owner and the Charterer acknowledge and agree that the Vessel may not be insured against Fire, Marine and Collision nor any other risks for the term of this Charter. In case of any accident or disaster the Charterer shall give the Owner prompt notice of same.

11.   The Charterer shall not be liable for damage to the Vessel unless the cost of repairs to the Vessel exceeds USD1,000,000 in which case the Charterer's liability shall be USD500,000 or the amount of the excess over USD1million whichever is the less and the amount of such liability shall be paid to the Owner PROVIDED, where the shares in the Owner are subject to a certain specified security agreement between Peter James Bethune as Lender and Ady Gil as Debtor dated the same day as this agreement, any liability outlined above shall be paid to the Lender under such agreement whose receipt shall be full and sufficient discharge.

12.   If the Vessel is lost or destroyed the liability of the Charterer shall be limited to USD500,000 which shall be paid to the Lender under the specified security agreement referred to in clause 11 or to the extent that the amount secured to the Lender is less than USD500,000 then as to the amount of such liability to the Lender and the balance to the Vendor.

## LIENS

13.   The Charterer, its agents and employees have no right or power to permit or suffer the creation of any maritime liens against the Vessel. The Charterer agrees to indemnify the Owner for any charges or losses in connection therewith including reasonable attorney's fees.

3

BEA3-1-23320

**DRUG RESTRICTION AND TERRORIST ACTIVITIES**

Charterer agrees that no illegal substances will be used or allowed on board the Vessel during the Charter.

16. If the Charterer is declared to be a terrorist organisation by the government of the United States of America or by another foreign state (but in the latter case only if such declaration is endorsed by the government of the United States of America) the Owner may cancel this agreement but without releasing the Charterer from any liability under this agreement which has accrued at the date of cancellation. Clause 17 of this agreement shall then become operative.

**OPTION TO ACQUIRE VESSEL**

18. If this agreement is terminated for any reason before the expiry of the Charter Term or any renewal of the Charter Term (including in the circumstances referred to in clause 15) or if not so terminated then at the end of the Charter Term or any renewal of the Charter Term the Owner hereby grants the Charterer the option to direct the Owner to transfer the vessel to the Charterer or its nominee without compensation or other payment SUBJECT HOWEVER to the Charterer assuming liability for the amount secured under the specified security agreement referred to in clause 11 AND if the option is exercised by the Charterer, Peter James Bethune as Lender and Ady Gil as Debtor consent to the novation (so that Ady Gil is released from all liability under such agreement and such liability is assumed by the Charterer) of such specified security agreement (as testified by their signatures to this agreement).

**REDELIVERY**

17. Except as otherwise provided in this agreement the Charterer agrees to redeliver the Vessel, her equipment, and furnishings, free and clear of any indebtedness incurred for Charterer's account, at the expiration of this Charter Term, to the Owner at such port as shall be mutually agreed or failing agreement at the Port of Auckland.

18. If this agreement is terminated under clause 15 the Captain of the Vessel, as the agent of the Owner, shall deliver the vessel at the Charterer's expense to the nearest port as soon as conveniently and safely possible, and the Captain's judgment as to when and how this will occur shall be final.

**NON ASSIGNMENT**

19. The Charterer agrees not to assign this Agreement or sub-charter the Vessel without the written consent of the Owner.

**CHARTERER'S AUTHORITY OVER CREW**

20. It is mutually agreed that full authority regarding the operation and management of the Vessel is hereby transferred to the Charterer for the term thereof.

In the event, however, that the Charterer wishes to utilize the services of a Captain and/or crew members in connection with the operation and management of the Vessel, it is agreed that said Captain and/or crew members are agents and employees of the Charterer and not the Owner, with the exception of Clause 18 in which case the Captain would act as an agent of the Owner.

The Captain shall receive and obey orders from the Charterer as to ports to be called at and the general course of the voyage, but the Captain, shall be responsible for the safe navigation of the Vessel, and the Charterer shall abide by his judgment as to sailing, weather, anchorages, and matters of safety. The Charterer assumes total control and liability (as outlined in Clauses 11 and 12) as if the Charterer were the owner of the Vessel during the term of the Charter.

The Charterer further agrees that it will not allow the Vessel to be operated by any person not qualified during the term of the Charter.

## CHARTERER'S NAME AND LOGOS

22. On the termination of this agreement for any reason, including expiry of the Charter Term or any renewal, the Charterer's logos and all other visual material relating to the Charterer must be removed from the Vessel or permanently painted over, unless the Charterer expressly consents in writing to their retention on the Vessel via a licensing agreement or some similar mechanism.

## ARBITRATION

23. Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, said arbitration to be held in the City of Annapolis, Maryland, unless another place is mutually agreed upon. Judgment upon any award reached by the Arbitrator(s) may be entered in any Court of said State having jurisdiction thereof.

To the true and faithful performances of the foregoing Agreement, the said parties hereto bind themselves, their heirs, executors, administrators, and assigns, each to the other.

24. This deed may be executed in any number of counterparts, (including facsimile or electronic copies) which when taken together shall constitute one and the same instrument, and any of the parties hereto may execute this deed by signing any such counterpart.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

SEA-1-23920

5



SIGNED on behalf of EARTHRACE LIMITED
by its sole director in the presence of:                    Director

Witness Signature

Witness Name          WILLIAM MALCOM PATERSON
                           SOLICITOR
                           AUCKLAND

Occupation

Address

SIGNED on behalf of SEA SHEPHERD CONSERVATION
SOCIETY by two authorised officers:

SIGNED by PETER JAMES BETHUNE
for the purpose of clause 16:

SIGNED by ADY GIL for the
purposes of clause 16:

SIGNED on behalf of EARTHRACE LIMITED
by its sole director in the presence of:                    Director

Witness Signature

Witness Name

Occupation

Address

SIGNED on behalf of SEA SHEPHERD CONSERVATION
SOCIETY by two authorised officers:

                                                       *swww*

                                                       Stephen Roest
                                                       Chief Executive Officer

                                                       Alex S. Earl
                                                       Associate Director

SIGNED by PETER JAMES BETHUNE
for the purpose of clause 16:

SIGNED by ADY GIL for the
purposes of clause 16:

SEA3-1-28920                                                    6

Exhibit B

1  **WRENN BENDER  LLLP**
   Aaron M. McKown, California Bar No. 208781
2  Email:  amckown@wrennbender.com
   Paula L. Zecchini, California Bar No. 238731
3  Email: pzecchini@wrennbender.com
   2 Park Plaza, Suite 550
4  Irvine, California  92614
   Telephone.: (949) 202-5810
5  Facsimile:  (949) 679-7939

6  **HARRIS & MOURE, PLLC**
   Hilary V. Keeling (State Bar No. 284518)
7  Email: hilary@harrismoure.com
   Charles P. Moure (Wash. Bar No. 23701)
8  Email: charles@harrismoure.com
   600 Steward St., Suite 1200
9  Seattle, WA 98101
   Telephone: (206) 224-5657
10 Facsimile: (206) 224-5659

11

12 Attorneys for Defendants
   SEA SHEPHERDCONSERVATION SOCIETY, AN OREGON NONPROFIT
13 CORPORATION, AND PAUL WATSON, AN INDIVIDUAL

14              **UNITED STATES DISTRICT COURT**

15             **CENTRAL DISTRICT OF CALIFORNIA**

16

17  ADY GIL, an individual, and          | Case No.
    EARTHRACE LIMITED,

18                                        |
              Plaintiffs,                 | **DECLARATION OF CHARLES**
19          v.                            | **MOURE IN SUPPORT OF**
                                          | **DEFENDANTS' NOTICE OF**
20  SEA SHEPHERD CONSERVATION             | **REMOVAL**
    SOCIETY, a California Corporation, PAUL
21  WATSON, an individual, and DOES 1     |
    through 25, inclusive,                | Removed from Los Angeles County
22                                        | Superior Court, Case No. BC 497814
              Defendants.
23

24

25

26

27

28

**WRENN BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

1    CHARLES P. MOURE declares as follows:

2    1. I am an attorney of Defendants Sea Shepherd Conservation Society and Paul

3    Watson in this case. I am over the age of 18 and competent to testify.

4    2. Defendant Sea Shepherd Conservation Society is a nonprofit organization

5    formed under the laws of Oregon with its principal place of business in Friday

6    Harbor, Washington.   Attached hereto as Exhibit 1 is a true and correct copy of the

7    Oregon Secretary of State's Business Registry for Sea Shepherd Conservation

8    Society demonstrating the entity is organized under the laws of Oregon with its

9    principal place of business in Washington.

10    3. Defendant Paul Watson is a citizen of Canada and currently does not reside in

11    the United States. Defendant Paul Watson has not been served with a copy of the

12    Summons or Complaint.

13    I declare under penalty of perjury under the laws of the United States of America

14    that the foregoing is true and correct to the best of my knowledge.

15    Executed this 29th day of January, 2013.

16

17                                        By: _s/ Charles P. Moure_

18                                        Charles P. Moure, WSBA #23701
                                          Attorney for Defendants
19                                        600 Stewart Street, Suite 1200
                                          Seattle, WA 98101
20                                        Telephone: (206) 224-5657
21                                        Fax: (206) 224-5659
                                          charles@harrismoure.com
22

23

24

25

26

27

28

WRENN BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

- 1 -

**EXHIBIT  1**

# Business Registry Business Name Search
## Business Entity Data

01-28-2013
16:01

| Registry Nbr | Entity Type | Entity Status | Jurisdiction | Registry Date | Next Renewal Date | Renewal Due? |
|---|---|---|---|---|---|---|
| 151874-12 | DNP | ACT | OREGON | 04-06-1981 | 04-06-2013 | |

| | |
|---|---|
| **Entity Name** | SEA SHEPHERD CONSERVATION SOCIETY |
| **Foreign Name** | |
| **Non Profit Type** | PUBLIC BENEFIT |

## Associated Names

| Type | PPB | PRINCIPAL PLACE OF BUSINESS | | |
|---|---|---|---|---|
| **Addr 1** | | 216 HALVORSEN RD | | |
| **Addr 2** | | | | |
| **CSZ** | | FRIDAY HARBOR | WA 98250 | **Country** UNITED STATES OF AMERICA |

| Type | AGT | REGISTERED AGENT | **Start Date** | 04-09-2007 | **Resign Date** | |
|---|---|---|---|---|---|---|
| **Of Record** | 161279-87 | DATA RESEARCH, INC. | | | | |
| **Addr 1** | 8130 SW BEAVERTON HILLSDALE HWY | | | | | |
| **Addr 2** | | | | | | |
| **CSZ** | PORTLAND  OR  97225 | | **Country** UNITED STATES OF AMERICA | | | |
| **Type** | MAL | MAILING ADDRESS | | | | |
| **Addr 1** | PO BOX 2616 | | | | | |
| **Addr 2** | | | | | | |
| **CSZ** | FRIDAY HARBOR | WA 98250 | **Country** UNITED STATES OF AMERICA | | | |

# Exhibit C

**EARTHRACE LIMITED**

**SEA SHEPHERD CONSERVATION SOCIETY**

---

**DEMISE CHARTER PARTY AGREEMENT**

---

**THIS AGREEMENT** is made this 24th day of _November_ 2009 by and between **EARTHRACE LIMITED** a duly incorporated company having its registered office at 470 Manukau Road, Epsom, Auckland and **SEA SHEPHERD CONSERVATION SOCIETY** of PO Box 2616, Friday Harbor WA 98250, USA.

**WHEREAS**

**EARTHRACE LIMITED** (hereinafter called the "Owner") owner of the Motor Vessel *Ady Gil* (formerly known as *Earthrace*). Registration number NZ 1271 designed by Craig Loomes Design Group Ltd built by Calibre Boats Ltd being an ultra slender trimaran now lying at the Maritime Museum, Viaduct Harbour, Auckland, NZ (hereinafter called the "Vessel" and, **SEA SHEPHERD CONSERVATION SOCIETY** (hereinafter called the "Charterer") desire to hire the Vessel for a specified period.

**NOW THEREFORE** the parties agree as follows:

**AGREEMENT TO LET**

1.　　The Owner agrees to let and the Charterer agrees to hire the Vessel on a bareboat basis for the Term of one year from 24 November 2009. The Charterer shall pay a Charter Fee of One US Dollar (US$1).

2.　　The Charter Fee does not include any running costs, charges of a captain and crew, the cost of fuel or any other operating expenses, insurance, liability insurance, boarding, embarkation and/or disembarkation and/or fees, if any; and food, beverage and/or catering services consumed during the Charter Term, all of which are expressly acknowledged to be the sole responsibility of the Charterer.

3.　　The Charterer may renew this agreement for a further period of one year and otherwise on the same terms and conditions of this agreement by notice in writing to the owner prior to the expiration of the term referred to in clause 1 above.

**INSPECTION AND DELIVERY**

4.　　The Charterer accepts the Vessel in its condition as inspected and approved prior to the date of this agreement.

5.　　The Charterer shall have the right, but not the obligation, to haul and survey the Vessel at the conclusion of the Charter Term, provided however, the cost of same shall be paid entirely by the Charterer.

6.　　The Owner or its designated agent agrees to make ready the Vessel for departure from the Port of Auckland on or before the commencement date of the charter.

**INTELLECTUAL PROPERTY**

7.　　For the period of the Charter Term and any renewal thereof the Owner assigns and transfers all right title and interest in and to any design patents, design

SEA3-1-23920　　　　　　　　　　　　　　　　　　　　　　　　2

patent applications, copyrights and other intellectual property (collectively "I P Rights") in the Vessel and the design of the Vessel including but not limited to all rights to make, have made, or import, for sale or for use in trade, any useful article embodying that design, and sell or distribute for sale or for use in trade any useful article embodying that design.

## INDEMNIFICATION

8.   The Charterer agrees to accept liability for and indemnify the Owner against any and all liability, claims, loss, damage, injury, proceedings, costs, legal costs and other expenses of any nature whatsoever, arising directly or indirectly out of the use of the Vessel during the Charter Term or any renewal of the Charter Term.

9.   The provisions of clause 8 do not apply in relation to damage to or loss of the Vessel during the Charter Term or any renewal thereof.   Clauses 11 and 12 apply to these events.

## INSURANCE; DAMAGE TO VESSEL; LOSS OF VESSEL

10.   The Owner and the Charterer acknowledge and agree that the Vessel may not be insured against Fire, Marine and Collision nor any other risks for the term of this Charter.   In case of any accident or disaster the Charterer shall give the Owner prompt notice of same.

11.   The Charterer shall not be liable for damage to the Vessel unless the cost of repairs to the Vessel exceeds USD1,000,000 in which case the Charterer's liability shall be USD500,000 or the amount of the excess over USD1million whichever is the less and the amount of such liability shall be paid to the Owner. **PROVIDED**, where the shares in the Owner are subject to a certain specified security agreement between Peter James Bethune as Lender and Ady Gil as Debtor dated the same day as this agreement, any liability outlined above shall be paid to the Lender under such agreement whose receipt shall be full and sufficient discharge.

12.   If the Vessel is lost or destroyed the liability of the Charterer shall be limited to USD500,000 which shall be paid to the Lender under the specified security agreement referred to in clause 11 or to the extent that the amount secured to the Lender is less than USD500,000 then as to the amount of such liability to the Lender and the balance to the Vendor.

## LIENS

13.   The Charterer, its agents and employees have no right or power to permit or suffer the creation of any maritime liens against the Vessel.   The Charterer agrees to indemnify the Owner for any charges or losses in connection therewith, including reasonable attorney's fees.

## DRUG RESTRICTION AND TERRORIST ACTIVITIES

14.   Charterer agrees that no illegal substances will be used or allowed on board the Vessel during the Charter.

15.   If the Charterer is declared to be a terrorist organisation by the government of the United States of America or by another foreign state (but in the latter case only if such declaration is endorsed by the government of the United States of America) the Owner may cancel this agreement but without releasing the Charterer from any liability under this agreement which has accrued at the date of cancellation. Clause 17 of this agreement shall then become operative.

## OPTION TO ACQUIRE VESSEL

16.   If this agreement is terminated for any reason before the expiry of the Charter Term or any renewal of the Charter Term (including in the circumstances referred to in clause 15) or if not so terminated then at the end of the Charter Term or any renewal of the Charter Term the Owner hereby grants the Charterer the option to direct the Owner to transfer the vessel to the Charterer or its nominee without compensation or other payment **SUBJECT HOWEVER** to the Charterer assuming liability for the amount secured under the specified security agreement referred to in clause 11 **AND** if the option is exercised by the Charterer, Peter James Bethune as Lender and Ady Gil as Debtor consent to the novation (so that Ady Gil is released from all liability under such agreement and such liability is assumed by the Charterer) of such specified security agreement (as testified by their signatures to this agreement) .

## REDELIVERY

17.   Except as otherwise provided in this agreement the Charterer agrees to redeliver the Vessel, her equipment, and furnishings, free and clear of any indebtedness incurred for Charterer's account, at the expiration of this Charter Term, to the Owner at such port as shall be mutually agreed or failing agreement at the Port of Auckland.

18.   If this agreement is terminated under clause 15 the Captain of the Vessel, as the agent of the Owner, shall deliver the vessel at the Charterer's expense to the nearest port as soon as conveniently and safely possible, and the Captain's judgment as to when and how this will occur shall be final.

## NON ASSIGNMENT

19.   The Charterer agrees not to assign this Agreement or sub-charter the Vessel without the written consent of the Owner.

## CHARTERER'S AUTHORITY OVER CREW

20.   It is mutually agreed that full authority regarding the operation and management of the Vessel is hereby transferred to the Charterer for the term thereof.

In the event, however, that the Charterer wishes to utilize the services of a Captain and/or crew members in connection with the operation and management of the Vessel, it is agreed that said Captain and/or crew members are agents and employees of the Charterer and not the Owner, with the exception of Clause 18 in which case the Captain would act as an agent of the Owner.

21.   The Captain shall receive and obey orders from the Charterer as to ports to be called at and the general course of the voyage, but the Captain shall be responsible for the safe navigation of the Vessel, and the Charterer shall abide by his judgment as to sailing, weather, anchorages, and matters of safety. The Charterer assumes total control and liability (as outlined in Clauses 11 and 12) as if the Charterer were the owner of the Vessel during the term of the Charter.

The Charterer further agrees that it will not allow the Vessel to be operated by any person not qualified during the term of the Charter.

**CHARTERER'S NAME AND LOGOS**

22.   On the termination of this agreement for any reason, including expiry of the Charter Term or any renewal, the Charterer's logos and all other visual material relating to the Charterer must be removed from the Vessel or permanently painted over, unless the Charterer expressly consents in writing to their retention on the Vessel via a licensing agreement or some similar mechanism.

**ARBITRATION**

23.   Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, said arbitration to be held in the City of Annapolis, Maryland, unless another place is mutually agreed upon. Judgment upon any award reached by the Arbitrator(s) may be entered in any Court of said State having jurisdiction thereof.

To the true and faithful performances of the foregoing Agreement, the said parties hereto bind themselves, their heirs, executors, administrators, and assigns, each to the other.

24.   This deed may be executed in any number of counterparts, (including facsimile or electronic copies) which when taken together shall constitute one and the same instrument, and any of the parties hereto may execute this deed by signing any such counterpart.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**SIGNED** on behalf of **EARTHRACE LIMITED**
by its sole director in the presence of:

Director

Witness Signature

Witness Name  WILLIAM MALCOM PATTERSON
SOLICITOR
AUCKLAND

Occupation

Address

**SIGNED** on behalf of **SEA SHEPHERD CONSERVATION
SOCIETY** by two authorised officers:

**SIGNED** by **PETER JAMES BETHUNE**
for the purpose of clause 16:

**SIGNED** by **ADY GIL** for the
purposes of clause 16:

SIGNED on behalf of **EARTHRACE LIMITED**
by its sole director in the presence of:

_____
Director

_____
Witness Signature

_____
Witness Name

_____
Occupation

_____
Address

SIGNED on behalf of **SEA SHEPHERD CONSERVATION
SOCIETY** by two authorised officers:

_____
Stephen Roest
Chief Executive Officer

_____
Alex S. Earl
Associate Director

SIGNED by **PETER JAMES BETHUNE**
for the purpose of clause 16:

_____

SIGNED by **ADY GIL** for the
purposes of clause 16:

_____

SEA3-1-23920                                                                6