1  **MAZZARELLA LAW GROUP**
   Mark C. Mazzarella, Esq. (SBN 082494)
2  Christopher Walters, Esq. (SBN 205510)
   1620 Fifth Ave., Suite 600
3  San Diego, California  92101-3235
   Telephone:  (619) 238-4900
4  Facsimile:   (619) 238-4959
5
   Attorneys  for Plaintiffs
6  Ady Gil and Earthrace Limited
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                 COUNTY OF LOS ANGELES CENTRAL DISTRICT
10

| | |
|---|---|
| 11  ADY GIL, an individual, and EARTHRACE LIMITED | Case No.   CV13-00657-GW (PLAx) |
| 12 | Assigned to Hon. George H. Wu |
| 13          Plaintiff, | |
| 14       v. | **FIRST AMENDED COMPLAINT FOR:** |
| 15  SEA SHEPHERD CONSERVATION SOCIETY, a California corporation, PAUL WATSON, and individual, and DOEs 1 through 25, inclusive, | **1. BREACH OF CONTRACT**<br>**2. RESCISSION**<br>**3. REFORMATION**<br>**4. CONVERSION**<br>**5. NEGLIGENCE** |
| 16 | |
| 17          Defendants. | |
| 18 | Complaint Filed:  January 7, 2013<br>Trial Date:  Not Assigned |
| 19 | |
| 20 | |
| 21 | **DEMAND FOR JURY TRIAL** |
| 22 | |

23     Plaintiffs Ady Gil ("Gil") and Earthrace Limited ("Earthrace") allege the following claims

24  and causes of action against Defendants Sea Shepherd Conservation Society ("Sea Shepherd"), Paul

25  Watson ("Watson"), and Does 1-25 inclusive.

26                    **I.     NATURE OF THE CASE**

27     1.     On January 6, 2010, the ship Ady Gil was rammed by a Japanese whaling ship, the

28  Shonan Maru #2, while supporting Sea Shepherd's attempts to disrupt the Japanese whaling efforts

                                    1
                    First Amended Complaint and Demand for Jury Trial

in the South Pacific Ocean, activities that had been featured for several years in the Animal Planet's television program "Whale Wars." Sea Shepherd, both through the Whaling Wars broadcasts, and through more traditional public relations networks told the world that the collision with the Japanese whaling ship sunk the Ady Gil. As alleged below, it lied.

2. The Ady Gil, previously named "Earthrace," (hereinafter the "Ady Gil" or "Earthrace") was well known by the boating community, having recently won a race around the world while captained by Pete Bethune ("Bethune"), who as a volunteer with Sea Shepherd was captain of the Ady Gil at the time of the collision. The Ady Gil was owned by a New Zealand entity, Earthrace Limited, the majority of stock of which had recently been purchased from Bethune by Gil, who is a United States Citizen.

3. Gil acquired control of Earthrace Limited for the express purpose of chartering the vessel to Sea Shepherd for $1 per year. The Ady Gil was chartered by plaintiffs to Sea Shepherd for the express purpose of assisting Sea Shepherd in its 2009-2010 campaign to stop Japanese whaling.

4. Sea Shepherd has supported its activities primarily from public donations, corporate sponsorships and from being featured in Animal Planet's "Whale Wars." Upon obtaining the use of the Ady Gil for its 2009-2010 campaign, Sea Shepherd engaged in a publicity campaign to promote its acquisition of the high-profile Ady Gil. The Ady Gil also became the focus of the "Whale Wars." Sea Shepherd's press release of Sea Shepherd's acquisition of the Ady Gil is still on its webpage as of the date of this filing. The video of the actual collision of the Ady Gil and the Shonan Maru #2 is also still featured on Sea Shepherd's web page as of the date of this filing. It is also widely available on other sites on the internet. To this date, Sea Shepherd continues to use the loss of the Ady Gil supposedly as a result of being rammed by the Japanese whaling vessel as a way of obtaining contributions from the public. And to this day, Sea Shepherd continues to deceive the public regarding what and who really sunk the Ady Gil.

5. As the result of the collision between the Ady Gil and the Shonan Maru #2, the "nose" of the Ady Gil was torn off, and the Ady Gil was rendered inoperable. However, the Ady Gil was otherwise not damaged and was repairable. Initially, the intention was to tow the vessel to port less than 100 miles away for repairs. But then Paul Watson ("Watson") the founder and functional

2
First Amended Complaint and Demand for Jury Trial

leader of Sea Shepherd, as well as the captain of one of the ships used by Sea Shepherd in its efforts to stop Japanese whaling, decided that the increased awareness of, and support for, Sea Shepherd that resulted from the collision would be taken to an even higher level if the collision did not just disable the Ady Gil, but rather sent it to the bottom of the South Pacific Ocean.

6. After two days, during which time the Ady Gil remained afloat without taking on water or otherwise giving any indication that it was sinking, Watson, the captain of the vessel, Steve Irwin, (which along with the Ady Gil and the vessel, Bob Barker, constituted the three vessel armada of Sea Shepherd) decided unilaterally, and with no notice to or consultation with, plaintiffs, to sink the Ady Gil, in order to gain favorable publicity by claiming that the Ady Gil sunk as a result of the collision with the Shonan Maru #2.

7. In order to carry out the scheme to deceive the public into thinking the Japanese had sunk the Ady Gil, and thereby obtain enhanced financial and other support from the public, Watson ordered Chuck Swift ("Swift") the captain of the Bob Barker, to flood the Ady Gil's engine compartment and turn off its GPS location devise. Swift then recruited Bethune and Luke Van Horn ("Van Horn") to assist him. Under cover of darkness, while others were sleeping, Swift, Bethune, and Van Horn carried out Watson's directive, and, to the extent possible, sank the Ady Gil. Because the material with which the hull of the Ady Gil is made is lighter than water, and therefore floats, it was impossible to completely submerge the vessel. However by sinking it to the extent possible, and turning off its GPS locater, defendants made it extremely unlikely that it would be found floating in the vast Pacific Ocean like a Kevlar and carbon fiber iceberg.

8. In Furtherance of the scheme, Watson instructed Bethune and Swift to tell the media and the public, as Watson himself did, that the Ady Gil sunk as a result to the collision. In fact, in the episode of "Whale Wars" that depicted the collision, Watson was shown several times telling Bethune that he should take advantage of the opportunity and "do all the media he can" regarding the incident.

9. Watson directed Bethune to keep the truth about the sinking of the Ady Gil a secret and specifically not to tell Gil that his boat had been salvageable and was purposefully destroyed.

1  Gil only found out about the deliberate destruction of his property through an e-mail from Bethune
2  months after the events.

3     10. Watson and others at the direction or request of defendants held fundraisers, one of
4  which was at Gil's house three days after the collision, and otherwise solicited contributions from
5  the public and sponsors to raise funds to replace the sunken Ady Gil. Some of the checks collected at
6  Gil's fundraiser had "To replace the Ady Gil" note in the memo of the check. A significant amount
7  of money was raised as a result of these efforts, yet none was ever put toward replacing the Ady Gil.

8     **II. THE PARTIES**

9     11. Plaintiff Ady Gil is a resident of the state of California and owner of Earthrace
10  Limited.

11     12. Plaintiff Earthrace Limited is a New Zealand business entity and the record owner of
12  the Ady Gil.

13     13. Defendant Sea Shepherd is an Oregon nonprofit organization, with its principal place
14  of business in Washington.

15     14. Defendant Watson was at all times acting as an agent of Sea Shepherd.

16     15. The true names and capacities of Defendants sued herein as Does 1 through 25,
17  inclusive, are presently unknown to Plaintiffs, who therefore sues these Defendants by such fictitious
18  names. Plaintiffs will amend this Complaint and include these Defendants' true names and
19  capacities when they are ascertained.

20     16. Plaintiffs are informed and believe and thereon allege that at all times mentioned
21  herein, each of the Defendants was the agent, alter-ego, servant, employee, instrumentality,
22  representative, partner or joint venture of each other Defendant and performed the acts as described
23  in this Complaint while acting within the scope of his, her or its authority and with the consent of
24  each other Defendant, and/or that each of the acts and/or omissions of every Defendant was ratified
25  by every other Defendant. Plaintiff is also informed and believes and thereon alleges that each of the
26  Defendants conspired to cause Plaintiff's damages alleged herein and/or aided and abetted each of
27  the other Defendants in the commission of the acts and/or omissions alleged herein and/or aided and
28

1  abetted each of the other Defendants in the commission of the acts omissions of the others, as
2  alleged herein.

### III.    JURISDICTION AND VENUE

4      17.    Venue and jurisdiction is proper in this judicial district because the parties have so
5  agreed, Gil resides in Los Angeles and some of the agreements which are the subject of this action
6  occurred within this judicial district.

### IV.    FACTUAL BACKGROUND

8      18.    In the summer of 2009 Gil, an avid animal rights advocate, was asked by Watson to
9  contribute $1,000,000 to Sea Shepherd to be applied toward the purchase of the Ady Gil. In
10 September 2009 Gil e-mailed Defendants that he was considering making the requested donation,
11 subject to Sea Shepherd adequately addressing several concerns and conditions Gil had relative to
12 the acquisition and donation of the Ady Gil to Sea Shepherd. On September 11, 2009 Gil received
13 responses by Watson and Steve Roest [the new CEO of Sea Shepard] to [Gil's] concerns and
14 requests" by e-mail to Gil from Susan Weingartner on behalf of defendants. In that e-mail, Ms.
15 Weingartner represents that "we will do everything in our power to meet your needs as much as
16 we're able, based on legalities, liability, non-profit rules that involve the IRS, etc." Among Gil's
17 concerns and defendants' responses to them were the following:

18     1.    **Concern:** The Ship will crash in the ice and sink.
19         **Response:** Highly unlikely because I will keep the vessel out of the ice.
20         The ship has just has [sic] one ton of Kevlar added to the hull so it is now
21         much stronger and the Kevlar carbon fiber [sic] hull is already stronger
22         than steel.
23     2.    **Concern:** The ship will break beyond repair….
24         **Response**: If and when repairs are needed it will be more expensive than a
25         standard vessel of the type but not significantly so. Most parts are from
26         common sourced ships; the unique hull, now that we know how to build it,
27         can be repaired or replaced altogether if necessary.
28

3. **Concern**: If Sea Shepherd breaks its promises to me, not that I think that you guy [sic] will, you can keep the ship and turn the $1,000,000 into a loan.

   **Response:** Agreed.

4. **Concern:** Make it go to Israel soon before my parents pass away. I owe it to my father who is 81 years old and my mother who is 75 years old.

   **Response:** I plan to take it to the Med for the tuna campaign and we would transit the Suez Canal so a stop in Israel would not be inconvenient. [Gil's father passed away in November 2012 having never seen the Ady Gil.].

19. At the time of this exchange of e-mail, and at all times thereafter, defendants knew that Gil was proceeding with the acquisition and donation of the Ady Gil in reasonable reliance on the truth of defendants' responses to these concerns and requests, and on defendants' good faith intention to perform as represented. Nonetheless, defendants failed to honor these promises and representations. The falsity of each promise and representation, and/or defendants' failure to perform as promised, is demonstrated by defendants' actions relative to each:

   A. Knowing of Gil's concerns that the ship would crash and sink, Watson personally assured Gil that his concerns were unfounded, because the ship could, and would, be repaired if damaged, yet less than 4 months later, as alleged above, not only did Watson fail to assure the ship would not sink, Watson directed other agents, servants and/or employees of defendants to sink the Ady Gil and disable its GPS locator. As a result of Watson's acts, the Ady Gil was sunk. Rather than repair the damage to the vessel's hull, which Gil was assured could be completely repaired, the ship is a total loss. Defendants even kept for themselves the electronic components that they stripped for the Ady Gil before sinking it.

   B. When the Ady Gil was damaged by the Japanese whaling ship, Shonan Maru #2, defendants did not repair it, as was feasible. Rather, with full

1  knowledge that it would not be difficult or prohibitively expensive to tow the Ady Gil to port for repairs, Defendants willfully and intentionally sunk the Ady Gil.

C. After breaking its promises to Gil, Sea Shepherd has not converted the $1,000,000 donation into a loan, as it agreed it would; and, as a result, as alleged below, Sea Shepherd is liable to Plaintiffs for the replacement cost of the Ady Gil.

D. Rather than repair the Ady Gil so it could be taken to Israel to be seen by Gil's parents as promised, it was sunk to perpetrate a public relations fraud by falsely claiming that the Ady Gil was sunk be the Japanese whalers, rather than willfully sunk by Defendants. Petitioner is informed and believes that his public relation fraud was perpetrated in an attempt to obtain sympathy for Sea Shepherd and to create animosity toward the Japanese whalers and thereby obtain increased financial support for Sea Shepherd through donations from the public. Meanwhile Gil's father, who passed away in 2012, never saw the ship.

20. On October 8, 2009, Gil wrote defendants to inform them of his intention to make a $1,000,000 donation to Sea Shepherd for the express purpose of acquiring the Ady Gil (then, still named the Earthrace), subject to certain conditions. Gil's letter ("hereinafter "the October Contract"), which documented the parties' partially oral-partially written agreement, was signed by Watson on October 8, 2009, and became enforceable according to its terms, which included the following provisions:

A. If Earthrace is sold, lost at sea, or rendered permanently unseaworthy for any reason at any time prior to the twentieth (20th) annual anniversary of the date Sea Shepherd first retained the title to Earthrace, Sea Shepherd agrees to name another vessel Ady Gil, pending the availability of such a vessel for this purpose.

7

First Amended Complaint and Demand for Jury Trial

B.  Any suit to enforce the terms of the agreement must be instituted in the Superior Court of the County of Los Angeles.

21. On October 8, 2009 Watson as further inducement for Gil to make the donation also handed Gil a letter from Watson personally, and on behalf of Sea Shepherd, stating, among other things, "If the Earthrace is lost in a campaign or by accident, The Sea Shepherd Conservation Society will apply your name to a replacement vessel." Watson further stated, confirming the trusting fiduciary relationship which existed between Gil and defendants, which was essential for Gil to be willing to donate $1 million for the acquisition of the Ady Gil, "I am proud to be partnered with you Ady. I think we will make a strong and effective team and we will make a significant impact on the poaching trade worldwide."

22. As alleged herein, the Ady Gil was rendered permanently unseaworthy as a result of Defendants' acts.. Yet Plaintiffs are informed and believe that no effort has been made to name another similar vessel the Ady Gil.

23. At the time the $1,000,000 donation was made by Gil to defendants, Earthrace as the Ady Gil was still known, was owned by an entity formed under New Zealand law entitled, "Earthrace Limited," a for profit company owned by Pete Bethune. Sea Shepherd deposited the $1,000,000 donation into its own account the day it was received from Gil.

24. The $1,000,000 however, was never paid to Earthrace Limited as originally intended. Gil was told by Defendants that this was because it would take so long to transfer Earthrace's flag to Sea Shepherd if Sea Shepherd purchased the Earthrace from Earthrace Limited that the Ady Gil would not be able to participate in the upcoming 2009-2010 campaign. Gil was also told by Respondents that Sea Shepherd could not itself purchase Earthrace, Limited, since if Sea Shepherd purchased the entity, Earthrace Limited, and thereby acquired ownership of the vessel Earthrace indirectly without loss of the flag, it would violate rules pertaining to not for profit entities such as Sea Shepherd that allegedly prevented a not for profit entity from owning a for profit entity

25. To accomplish the objective of acquiring Earthrace/the Ady Gil for use by Sea Shepherd, without the delay that would be caused by the need to apply for a new flag, and without violating the rules which defendants claimed prevented Sea Shepherd from having an ownership

8

First Amended Complaint and Demand for Jury Trial

interest in a for profit company such as Earthrace Limited, it was agreed that Gil would personally purchase Earthrace Limited from Pete Bethune for $1.5 million, $1 million of which would be paid "up front" by Gil, and $500,000 remaining would be paid at a later date by Gil unless the Ady Gil was lost at sea, in which case it became Sea Shepherd's obligation to pay the remaining $500,000. At the same time, Earthrace Limited agreed to lease/charter the Ady Gil to Sea Shepherd for $1 per year. The $500,000 obligation was secured by a security agreement between Gil, Sea Shepherd and Bethune, a true and correct copy of which is attached hereto as Exhibit "A." Additionally a Charter Agreement, a true and correct copy of which is attached hereto as Exhibit "B" was executed by Gil, Sea Shepherd, and Bethune.

26. Defendants told Gil that they would need to rescind the October Contract in order to return the $1 million previously received by Sea Shepherd to Gil, (not physically but with respect to the right of ownership), and then forward the $1 million, on Gil's behalf, to the trust account of a lawyer in New Zealand who would prepare the new agreement to reflect the purchase of Earthrace Limited by Gil, and the charter of the ship by Earthrace Limited to Sea Shepherd. There was no discussion, or mention, at any time, regarding any intent to change the terms and conditions upon which Gil had insisted in the October Contract and to which Defendants agreed. Defendants represented that the new agreement was simply going to reflect the different method of acquisition and donation of the Ady Gil from Gil to Sea Shepherd. Gil was told by Defendants that no aspect of their agreement would be affected by the "rescission" of the October Contract, except the manner of effecting the donation. Gil believed any new agreement would satisfy all of the conditions addressed in the October Contract. Gil further alleges on information and belief that Defendants knew that Gil believed the rescission of the October Contract and the execution of any new contract(s) would not alter the essential conditions upon which Gil insisted as a condition to his donation, and specifically, that either the Ady Gil, or if it was lost in the campaign, a comparable replacement vessel, would bear Gil's name for 20 years, if Defendants did not keep their promises the donation would be converted to a loan, and any disputes would be resolved in Los Angeles County where Gil resides.

27. While Gil was in an Air New Zealand terminal preparing to board a flight to New Zealand, defendants gave Gil a document entitled "Rescission of Letter of Agreement. Without

1  Reservation," which defendants represented had to be signed by Gil before the $1,000,000 could be
2  wired to the lawyer in New Zealand immediately. Gil had only a few minutes at the airport to review
3  the document, and was not able to have the benefit of legal review, advice, and comment.  Gil
4  accepted as true the representation contained in the document that rescission of the October Contract
5  was required because of "various laws that regulate charitable organizations," which Gil was told by
6  Defendants referred specifically to the inability of a not for profit entity to own a for profit entity
7  such as Earthrace Limited.  In fact, Defendants' representation was false, and Plaintiffs are informed
8  and believe Defendants knew it to be false.  In fact, a 501c3 entity such as Sea Shepherd can have
9  business income without losing its tax-exempt status as long as it pays tax on the income generated
10 from a for-profit asset. In fact, a review of Sea Shepherd's tax returns from recent years reflects that
11 Sea Shepherd did have some taxable income, as Defendant must have known since it was reflected
12 in Sea Shepherd's tax return.

13       28.     Had this representation been true, as Gil believed it to be since he trusted defendants,
14 it would have been impossible for Sea Shepherd to purchase Earthrace Limited as Gil ultimately did.
15 This was the sole justification for the rescission of the October Contract and replacement with new
16 agreements.  However, the representation was false, and at the time it was made, defendants knew it
17 was false, and lied to Gil in order to convince him personally to buy Earthrace, which required Gil to
18 commit to paying an additional $500,000 under certain conditions rather than for Sea Shepherd to
19 use Gil's $1 million donation for the initial payment for Earthrace Limited, and for Sea Shepherd to
20 be responsible for payment of the $500,000 balance, and/or to provide an excuse for rescinding the
21 October Contract.

22       29.     When Gil was asked to rescind the October Contract, he was told that it would be
23 replaced with a new agreement. He believed the new agreement would not eliminate any of the
24 specific conditions to which defendants agreed in the September 11, 2009 e-mail and which were in
25 the October Contract.  Gil is informed and believes that Defendants knew that Gil would not proceed
26 with the acquisition and donation of the Ady Gil without those conditions being a part of the
27 agreement, and that at the time Gil signed the purported rescission document, Defendants knew that
28 he believed the October Contract would be replaced with an agreement that contained the same

conditions as the October Contract, which Gil had made clear were a requirement if he were to proceed.

30. On or about November 24, 2009, the Security Agreement, relative to the remaining $500,000 of the purchase price was executed, whereby Gil promised to pay Bethune the balance of the purchase price of Earthrace Limited, $500,000, secured by 2,057,291 ordinary shares of stock in the capital of Earthrace Limited.  At the same time, Gil, Bethune and Sea Shepherd executed the "Demise Charter Party Agreement," whereby Sea Shepherd chartered the Ady Gil for one year, from November 24, 2009 to November 23, 2010, with an option to renew the charter for an additional year on the same terms. While possession of the Ady Gil was transferred to Sea Shepherd, no rights of ownership were transferred, and Gil through his ownership of Earthrace Limited, retained the rights of ownership of the Ady Gil.

31. Full authority regarding the operation of the Ady Gil was transferred to Sea Shepherd pursuant to paragraph 20 of the Charter Agreement, which also provides that any captain or crew members utilized by Sea Shepherd to operate the Ady Gil are the agents of Sea Shepherd, not Gil.

32. Paragraph 17 of the Charter Agreement required Sea Shepherd to redeliver the Ady Gil to Gil at the end of the term of the charter, along with all of her equipment and furnishings. Paragraphs 11 and 12 of the Charter Agreement provide that in the event of the total destruction of the Ady Gil, Sea shepherd was obligated to pay $500,000 directly to Bethune. However, if the Ady Gil was damaged, but not destroyed, Sea Shepherd was obligated to pay the $500,000 to Gil.

## V.   FIRST CAUSE OF ACTION

### Breach of Contract (against Sea Shepherd)

33. Plaintiffs incorporate the above paragraphs as though fully alleged herein.

34. The agreement between Plaintiffs and Sea Shepherd is partially oral and partially written, and is memorialized in 5 written documents, which evidence the contract between plaintiffs and defendants: and which restate the parties' oral agreement:  (1) Defendants' September 11, 2009 e-mail to Gil responding to his concerns; (2) the October Contract; (3) Watson's October 8, 2009 letter to Gil; (4) the Security Agreement; and (5) The Charter Agreement.

35. Sea Shepherd breached both the express terms of its partially oral and partially written agreement with Plaintiffs, and the covenant of good faith and fair dealing which is implied in every contract.. Sea Shepherd's breach of the contract was in bad faith and unfairly interfered with Plaintiffs' right to receive the benefits of the contract.

36. As alleged below, the defendants' attempt to rescind the October Contract is void and unenforceable, as it was procured as a result of fraud, mistake and duress, and is inconsistent with the defendants' oral representations as to its content and effect, upon which Gil relied while fully performing his obligations under the agreement. Defendants are estopped from asserting the October Contract is not valid and enforceable, and the Rescission of the October Contract should itself be rescinded or reformed as alleged below.

37. Defendants expressly and/or impliedly promised Gil in Defendants' September 11, 2009 reply to Gil's e-mail expressing his concerns, in the October Contract in Watson's letter to Gil of October 8, 2009, in the Security Agreement and in the Charter Agreement, that: (1) they "would do everything possible to meet [Gil's] needs; (2) they would do everything possible to keep the Ady Gil from sinking; (3) that in the event of damage, specifically damage to the hull as occurred in the January 6, 2009 incident, the damage could be, and would be, repaired; (4) that if Respondents broke any of their promises to Gil the $1 million provided by Gil would be treated as a loan; (5) that if the Ady Gil was lost, another ship would be given that name, and (6) that the Ady Gil would be taken to Israel soon for Gil's father to see.

38. Plaintiffs fully performed all of their duties under the contracts.

39. Defendants breached the contract by, among other things, intentionally sinking the Ady Gil, failing to take any action to either convert the $1,000,000 to a loan, or put Gil's name on another ship, and by failing to return the Ady Gil, along with all of its equipment and furnishings, at the end of the charter.

40. Defendants' breaches of the contracts were in bad faith and deliberately calculated by defendants to interfere with Plaintiffs' rights to receive their contractual benefits.

41. As a direct and proximate result of defendants' breaches, Plaintiffs have suffered damages including the value, measured by the replacement cost, of the Ady Gill which is not less

than $5,000,000. Plaintiffs have suffered other consequential damages as a result of the Defendants' breaches, the exact nature and amount of which are not currently known, but will be proven at trial.

## VI. SECOND CAUSE OF ACTION

### Rescission (against Sea Shepherd)

42. Plaintiffs incorporate the above paragraphs as though fully alleged herein.

43. As alleged above, Defendants' "Rescission" of the October Contract was based on fraudulent representations, and is therefore void at Plaintiffs' election. The attempted "Rescission" should be rescinded in its entirety, as it was not truly necessary and never would have been signed but for Defendants' misrepresentations. Upon order of the Court, Plaintiffs are willing to return all benefits received under the October Contract as a condition of the rescission.

## VII. THIRD CAUSE OF ACTION

### Reformation (against Sea Shepherd)

44. Plaintiffs incorporate the above paragraphs as though fully alleged herein.

45. If the Defendants' attempted "Rescission" of the October Contract is not rescinded in its entirely, it should be reformed to eliminate the purported rescission of the October Contract in its entirety, and to provide only that the October Contract is modified as needed to reflect the change in the method by which Gil's contribution was to be made.

## VIII. FOURTH CAUSE OF ACTION

### Conversion (against all defendants)

46. Plaintiffs incorporate the above paragraphs as if fully alleged herein.

47. Plaintiffs owned or had an ownership interest in the ship the Ady Gill.

48. By sinking the Ady Gil without the permission and against the wishes of plaintiffs instead of repairing it as promised, defendants converted Plaintiffs' personal property. Defendants intentionally and substantially interfered with Plaintiffs' property by destroying or causing to be destroyed.

49. Defendants' conduct was a substantial factor in causing harm to plaintiffs in an amount to be proven at trial, but no less than $5,000,000.

50. Defendant's conduct was willful, fraudulent, malicious and oppressive, as a result of which Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish defendants and deter like conduct by defendants, and others, in the future.

### IX.     FIFTH CAUSE OF ACTION

#### Negligence (against all defendants)

51. Plaintiffs incorporate the above paragraphs as though fully alleged herein.

52. Defendants conduct as alleged herein, and in particular the intentional sinking of the Ady Gil, was unreasonable and fell below the standard of care applicable to persons of individuals situated similarly to defendants.  The evidence of this breach is supported by Defendants' violation of Section 594 of the California Penal Code, which constitutes negligence per se..

53. Defendants' conduct was a substantial factor in causing harm to plaintiffs as alleged above in an amount to be proven at trial, but no less than $5,000,000.

### X.     PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

1. For compensatory damages according to proof at trial, but not less than $5,000,000;
2. For punitive damages up to nine times the amount of compensatory damages;
3. For rescission, or in the alternative, reformation of the "Rescission" letter;
4. For attorneys' fees and costs according to proof at trial;
5. For any other such relief as the Court may deem just and proper.

Dated:     June 3, 2013                    **MAZZARELLA LAW GROUP**

By:     */s/Mark C. Mazzarella*
        Mark C. Mazzarella
        Attorneys for Plaintiffs